926 F.2d 116
 59 USLW 2441, 13 Employee Benefits Ca 1289
 Frank L. BIRD, Trustee of the Frank L. Bird Profit Sharing
Trust, Frank L. Bird, Individually, and Joan Shea, Appellees,
v.
SHEARSON LEHMAN/AMERICAN EXPRESS, INC., and Raymond R.
Clements, Appellants.
 No. 721, Docket 90-7688.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1990.
Decided Jan. 17, 1991.
 
 Jeffrey L. Friedman, New York City (Theodore A. Krebsbach, New York City, on the brief), for appellants Shearson Lehman/American Express, Inc. and Raymond R. Clements.
 Donald R. Holtman, Hartford, Conn. (Katz & Seligman, Hartford, Conn., on the brief), for appellees Frank L. Bird, Trustee of the Frank L. Bird Profit Sharing Trust, Frank L. Bird, Individually, and Joan Shea.
 Before TIMBERS, KEARSE and MINER, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Appellants Shearson Lehman/American Express, Inc. (Shearson) and Raymond R. Clements appeal from an order entered July 16, 1990 in the District of Connecticut, Jose A. Cabranes, District Judge, denying their motion to compel arbitration of a claim brought by appellees Frank L. Bird, Individually and as Trustee of the Frank L. Bird Profit Sharing Trust, and Joan Shea for breach of fiduciary duty pursuant to the Employee Retirement Income Security Act (ERISA). 29 U.S.C. Sec. 1001 et seq. (1988).
 
 
 2
 On appeal, appellants contend that the Federal Arbitration Act (FAA), 9 U.S.C. Sec. 1 et seq. (1988), requires that agreements to arbitrate statutory ERISA claims are enforceable.
 
 
 3
 For the reasons that follow, we reverse the judgment of the district court and remand for proceedings consistent with this opinion, including arbitration forthwith.
 
 I.
 
 4
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 5
 Frank L. Bird is the Trustee and a participant and beneficiary in the Frank L. Bird Profit Sharing Trust (the Trust). Joan Shea is a participant and beneficiary in the Trust. The Trust was established to provide for the retirement of its participants and beneficiaries and is governed by the terms of ERISA.
 
 
 6
 Raymond Clements, a broker and vice president of Shearson, solicited Bird as a client. Bird was interested in investing the assets of the Trust. At their first meeting, Bird alleges that he explained to Clements that the investment objectives for the Trust were long term growth and safety of the Trust's assets. In his capacity as Trustee, Bird invested all the assets of the Trust in a securities account with Shearson.
 
 
 7
 Bird signed Shearson's standard "Customer's Agreement" prior to opening the account. That agreement contained an arbitration clause which provided that
 
 
 8
 "Unless unenforceable due to federal or state law, any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect."
 
 
 9
 All of the Trust's assets, a total of $62,205.56, were deposited in the account. Fifty-five transactions were made in the account between July 24, 1984 and May 28, 1986. At the end of that period, $13,427.53 remained in the account. Appellees allege that the assets of the Trust were diminished due to mishandling by appellants, who allegedly made high risk investments on behalf of the Trust in disregard of the stated investment objectives of the Trust.
 
 
 10
 On July 21, 1987, appellees commenced this action and filed the complaint in the District of Connecticut. Count one of the complaint alleged a breach of fiduciary duties under ERISA. 29 U.S.C. Sec. 1104 (1988). Count two alleged that the account had been churned in violation of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j (1988), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1990). The complaint also set forth various state law claims; these subsequently were dismissed.
 
 
 11
 On August 18, 1987, appellants filed a motion invoking the arbitration clause in the Customer's Agreement and seeking a stay of proceedings in the district court. The district court granted the motion as to the securities law claim, but denied the motion as to the ERISA claim. We affirmed the district court's decision. Bird v. Shearson Lehman/American Express, Inc., 871 F.2d 292 (2 Cir.1989) (Bird I ). We held that Congress intended to preclude a waiver of judicial remedies for statutory ERISA claims, but not for contractual claims involving ERISA-covered plans. Id. at 298.
 
 
 12
 Appellants filed a petition for a writ of certiorari in the Supreme Court. In the meantime, the Supreme Court filed its opinion in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). In Rodriguez, the Court held that agreements to arbitrate statutory claims arising under the Securities Act of 1933 were enforceable. Subsequently, the Court granted certiorari in Bird I, vacated our judgment, and remanded the case for reconsideration in light of Rodriguez. Shearson Lehman/American Express, Inc. v. Bird, --- U.S. ----, 110 S.Ct. 225, 107 L.Ed.2d 177 (1989).
 
 
 13
 On January 19, 1990, we entered an order remanding the case to the district court for reconsideration in light of Rodriguez. On July 16, 1990, the district court, in a thoughtful opinion, affirmed its original decision. The district court reasoned that "Rodriguez [was] consistent with the Supreme Court's other recent rulings on arbitration and therefore [did] not significantly change the legal landscape in which this issue was originally considered." The district court held that statutory ERISA claims were not subject to compulsory arbitration. The court denied appellants' motion to compel arbitration and for a stay of the district court proceedings pending arbitration.
 
 
 14
 This appeal followed.
 
 II.
 
 15
 Initially, we set forth our standard of review. "[A] court asked to stay proceedings pending arbitration in a case covered by the [FAA] has essentially four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2 Cir.1987) (citations omitted). We review the district court's determinations on those issues de novo. Id. at 846.
 
 
 16
 In Bird I, we affirmed the district court's holding that Bird and Shearson entered into a valid arbitration agreement that encompassed the ERISA claim. Bird I, supra, 871 F.2d at 295. We see no reason to disturb that holding. Accordingly, the only issue before us on the instant appeal concerns the third element, i.e., whether Congress intended statutory claims created by ERISA to be nonarbitrable.
 
 III.
 
 17
 We turn first to appellants' contention that the FAA requires that their agreement to arbitrate be enforced notwithstanding the fact that appellees' claim is for a breach of fiduciary duties under ERISA. We agree.
 
 
 18
 In Bird I, we held that the text of ERISA--particularly the provisions for exclusive federal jurisdiction of statutory claims, the remedial nature of the statute, and the underlying purposes of ERISA--compelled the conclusion that "Congress intended the federal courts to be the exclusive forum for resolving disputes of substantive rights." Bird I, supra, 871 F.2d at 295. We are told that Bird I was motivated, in part, by an "outmoded presumption of disfavoring arbitration proceedings". Rodriguez, supra, 109 S.Ct. at 1920. Rodriguez makes it clear that that is no longer tenable. Accordingly, we now reach a contrary result.
 
 
 19
 The FAA, "reversing centuries of judicial hostility to arbitration agreements, was designed to allow parties to avoid 'the costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts . . . .' " Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11, 94 S.Ct. 2449, 2452-53, 41 L.Ed.2d 270 (1974) (footnote and citation omitted). Section 2 of the FAA provides that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. Sec. 2 (1988). "Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); see also Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985) (the FAA "requires that we rigorously enforce agreements to arbitrate").
 
 
 20
 The "duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). Congress, however, may override the presumption favoring arbitration agreements by a contrary provision in another statute. Id. The burden of demonstrating such congressional intent rests with the party opposing arbitration. Rodriguez, supra, 109 S.Ct. at 1921; McMahon, supra, 482 U.S. at 227, 107 S.Ct. at 2337. The party contending that an agreement to arbitrate a statutory claim is not enforceable must show that "Congress intended in a separate statute to preclude a waiver of judicial remedies . . . ." Rodriguez, supra, 109 S.Ct. at 1921. "[S]uch an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes." McMahon, supra, 482 U.S. at 227, 107 S.Ct. at 2338 (citations omitted).
 
 
 21
 Applying these standards in a series of recent cases, the Supreme Court has upheld arbitration agreements involving various statutory claims. E.g., McMahon, supra, 482 U.S. at 227-38, 107 S.Ct. at 2337-44 (claim under Sec. 10(b) of the Securities Exchange Act of 1934); id. at 238-42 (claim under civil provisions of Racketeer Influenced and Corrupt Organizations Act); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628-40, 105 S.Ct. 3346, 3354-61, 87 L.Ed.2d 444 (1985) (claim under Sherman Antitrust Act). Most recently, the Court held that agreements to arbitrate claims brought pursuant to the Securities Act of 1933 are enforceable. Rodriguez, supra, 109 S.Ct. at 1919-21. In so holding, the Court overruled its holding in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (a 1933 Act decision), which it stated "rested on suspicion of arbitration as a method of weakening the protections afforded in the substantive law" and had "fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." Rodriguez, supra, 109 S.Ct. at 1920.
 
 
 22
 Prior to Rodriguez, courts of appeals that considered the enforceability of agreements to arbitrate claims derived from ERISA reached varying conclusions. Compare Bird I, supra, 871 F.2d at 298 (agreement to arbitrate statutory ERISA claims is not enforceable) and Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 941 (3 Cir.1985) (same) with Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc., 847 F.2d 475, 477-79 (8 Cir.1988) (agreement to arbitrate statutory ERISA claim is enforceable). No court of appeals has considered this issue since Rodriguez. This case is one of first impression.
 
 
 23
 (A)
 
 
 24
 We consider next the text and legislative history of ERISA. We find nothing in the text or legislative history explicitly addressing the issue of whether Congress intended to preclude a waiver of a judicial forum for claims arising from the substantive guarantees of ERISA. We also find nothing in the text or legislative history that compels us to reach that conclusion by implication.
 
 
 25
 We are aware that one of the means by which Congress sought "to protect ... participants in employee benefit plans and their beneficiaries" was "by providing ... ready access to the Federal courts." 29 U.S.C. Sec. 1001(b) (1988). This provision, however, does not speak to whether Congress intended to require that parties avail themselves of that forum. Sulit, supra, 847 F.2d at 478. It does not follow that "by permitting a federal judicial forum Congress also intended to override the Arbitration Act's aim of ensuring the enforcement of privately made agreements in which parties ... have chosen to forego an available judicial forum in favor of arbitration." Id. at 479.
 
 
 26
 Similarly, the fact that Congress provided for exclusive federal jurisdiction of claims brought to enforce ERISA's substantive provisions, 29 U.S.C. Sec. 1132(e) (1988), speaks only to which judicial forum is available, not to whether an arbitral forum is available. Moreover, the Supreme Court has upheld an arbitration agreement which was involved in a dispute grounded in a statute that similarly provides for exclusive federal jurisdiction. E.g., McMahon, supra, 482 U.S. at 227, 107 S.Ct. at 23 (Securities Exchange Act of 1934, 15 U.S.C. Sec. 78aa (1988)). In short, "any claim that the jurisdictional language of ERISA evidences a congressional intent to foreclose arbitrability would appear to be untenable in light of McMahon and [Rodriguez ]." Southside Internists Group v. Janus Capital Corp., 741 F.Supp. 1536, 1541 (N.D.Ala.1990).
 
 
 27
 Liberal procedural provisions that facilitate bringing ERISA claims in federal court pursuant to Sec. 1132 also do not compel a conclusion that Congress intended such claims to be nonarbitrable. The Supreme Court rejected that reasoning in Rodriguez. It declined to imply such an intent based on similar provisions that govern claims brought in the federal courts pursuant to the Securities Act of 1933. Rodriguez, supra, 109 S.Ct. at 1920.
 
 
 28
 We hold that ERISA's text and legislative history do not support a conclusion that Congress intended to preclude arbitration of claims brought pursuant to it.
 
 
 29
 (B)
 
 
 30
 We turn next to whether arbitration is inconsistent with ERISA's underlying purposes. We hold that it is not.
 
 
 31
 In its statement of findings and declaration of policy, Congress explained the circumstances leading to the passage of ERISA and the purpose of the legislation:
 
 
 32
 "that despite the enormous growth in [pension] plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable ... that minimum standards be provided assuring the equitable character of such plans and their financial soundness."
 
 
 33
 29 U.S.C. Sec. 1001(a) (1988). "A reading of the statute's legislative history compels the conclusion that ERISA's purpose is to secure guaranteed pension payments to participants by insuring the honest administration of financially sound plans." Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911, 914 (2 Cir.), cert. denied, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989) ("ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits' " (citations omitted)). Allowing parties to provide by agreement that their disputes will be resolved in arbitration is not inconsistent with those purposes.
 
 
 34
 "By agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi, supra, 473 U.S. at 628, 105 S.Ct. at 3354. Thus, arbitration is inconsistent with the underlying purposes of a statute "where arbitration is inadequate to protect the substantive rights at issue." McMahon, supra, 482 U.S. at 229, 107 S.Ct. at 2339.
 
 
 35
 A presumption that arbitration is an inadequate forum in which to resolve disputes based on complex federal statutes is untenable in light of recent Supreme Court decisions. Id. at 232107 S.Ct. at 2340; Mitsubishi, supra, 473 U.S. at 633-34, 105 S.Ct. at 3357-58. Rodriguez put to rest " 'the old judicial hostility to arbitration.' " Rodriguez, supra, 109 S.Ct. at 1920 (citation omitted). Appellees suggest no reason why the substantive rights guaranteed by ERISA will be jeopardized if the arbitration agreement is enforced. We are aware of no such reasons. As in Rodriguez, " '[t]here is nothing in the record before us nor in the facts of which we can take judicial notice, to indicate that the arbitral system ... would not afford the plaintiff[s] the rights to which [they] are entitled.' " Id. 109 S.Ct. at 1921 (citation omitted). Accordingly, we disagree with those courts that have expressed the fear that substantive rights guaranteed by ERISA may be foreclosed by an arbitration agreement. E.g., Barrowclough, supra, 752 F.2d at 941; Amaro v. Continental Can Co., 724 F.2d 747, 752 (9 Cir.1984).
 
 
 36
 Similarly, ERISA's remedial nature, Firestone, supra, 489 U.S. at 108, 109 S.Ct. at 952, is not compromised "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, [since] the statute will continue to serve ... its remedial ... function." Mitsubishi, supra, 473 U.S. at 614, 105 S.Ct. at 3347. The Supreme Court has upheld agreements to arbitrate claims arising under other remedial statutes. E.g., McMahon, supra, 482 U.S. at 240, 107 S.Ct. at 2344 (considering remedial role of RICO); Mitsubishi, supra, 473 U.S. at 636-37, 105 S.Ct. at 3358-59 (considering remedial role of antitrust legislation).
 
 
 37
 Appellees contend that their view is supported by a line of cases that held that arbitrations of claims under Title VII of the Civil Rights Act of 1964, Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Fair Labor Standards Act, Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and 42 U.S.C. Sec. 1983 (1988), McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) were not preclusive in subsequent litigation to vindicate rights under those statutes. We disagree.
 
 
 38
 In those three cases, the arbitrations were commenced pursuant to a clause in a collective bargaining agreement negotiated by the union, rather than the employee. They rely partially on the reasoning that an employee should not be bound by an arbitration clause he did not negotiate "where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." Barrentine, supra, 450 U.S. at 737, 101 S.Ct. at 1443. The Court was concerned with the fact that the union's interest might not coincide with the employee's and, therefore, the union's representation at arbitration might not be adequate. McDonald, supra, 466 U.S. at 291, 104 S.Ct. at 1803; Barrentine, supra, 450 U.S. at 742101 S.Ct. at 1445; Gardner-Denver, supra, 415 U.S. at 58 n.19, 94 S.Ct. at 1024 n.19.
 
 
 39
 The instant case does not raise such concerns. Bird signed the agreement that contained the arbitration clause. He cannot complain that his rights were bargained away by a third party. Although Shea did not sign the agreement, her interests and claims are essentially identical to Bird's. Under such circumstances, requiring Shea to arbitrate does not work an injustice. Cf. Barrowclough, supra, 752 F.2d at 938-39 (beneficiaries are bound by principal's agreement to arbitrate when they "claim no present entitlement to the [benefits] and press no claims separate from his").
 
 
 40
 We also do not find arbitration inconsistent with the enforcement and oversight responsibilities granted to the Secretary of Labor. The Secretary is involved in reporting requirements, 29 U.S.C. Sec. 1021 (1988), is authorized to commence an action for a plan fiduciary's breach of duty, 29 U.S.C. Sec. 1132(a)(2) (1988), and is authorized to participate in litigation commenced by plan participants, 29 U.S.C. Sec. 1132(h) (1988). Moreover, the Secretary is vested with broad investigatory powers to determine compliance with ERISA's provisions. 29 U.S.C. Sec. 1134 (1988). "We are reluctant to conclude that the mere fact of administrative involvement in a statutory scheme of enforcement operates as an implicit exception to the presumption of arbitral availability under the FAA." Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 198 (4 Cir.), cert. granted, --- U.S. ----, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990). Arbitration of ERISA claims will not impede the Secretary's supervisory and enforcement responsibilities. "[I]mplementation of the statutory purpose is [not] dependent upon the [Secretary's] involvement in each and every allegation [under ERISA]." Id.
 
 
 41
 Finally, one of the purposes of ERISA is to "bring a measure of uniformity in an area where decisions under the same set of facts may differ from state to state." H.R.Rep. No. 533, 93rd Cong. 1st Sess. 12 (1973), reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4650. This desire has led the Supreme Court to conclude that Congress intended that "courts ... develop a 'federal common law of rights and obligations under ERISA-regulated plans.' " Firestone, supra, 489 U.S. at 110, 109 S.Ct. at 954 (citation omitted). We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.
 
 
 42
 First, we do not believe that our holding will prevent the development of federal common law in this area. Our holding does not prohibit plaintiffs from bringing ERISA claims alleging a breach of fiduciary duty in federal courts. We merely hold that parties may provide by agreement that such claims will be arbitrated. If such agreements are the result of unequal bargaining power between the parties, general principles of contract law will bar enforcement. Second, the import of recent Supreme Court decisions is that arbitration is not to be distrusted no matter what the source of law to be applied is. Third, an arbitration determination is subject to review by the federal courts through a motion to enforce or to vacate the award.
 
 
 43
 Arbitration is not inconsistent with the underlying purposes of ERISA. Appellees have not sustained their burden of demonstrating that the text, legislative history, or underlying purposes of ERISA indicate that Congress intended to preclude a waiver of a judicial forum for claims arising under it. Accordingly, we hold that statutory claims arising under ERISA may be the subject of compulsory arbitration.
 
 IV.
 To summarize:
 
 44
 We hold that Congress did not intend to preclude a waiver of a judicial forum for statutory ERISA claims. We further hold that the FAA requires courts to enforce agreements to arbitrate such claims. The district court, therefore, erred in denying appellants' motion to compel arbitration of appellees' ERISA claim and for a stay of the district court proceedings pending arbitration.
 
 
 45
 Reversed and remanded with instructions that arbitration proceed promptly. The mandate shall issue forthwith.
 
 KEARSE, Circuit Judge, dissenting:
 
 46
 I respectfully dissent from the majority's conclusion that an agreement to arbitrate future claims of breach of fiduciary responsibility under ERISA, 29 U.S.C. Sec. 1101 et seq. (1988), is enforceable. Despite the general federal policy favoring arbitration, see, e.g., Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), arbitration should not be ordered where there is "an inherent conflict between arbitration and the statute's underlying purposes," Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 227, 107 S.Ct. 2332, 2338, 96 L.Ed.2d 185 (1987). I believe there is such a conflict between arbitration and ERISA.
 
 
 47
 The underlying purpose of ERISA is "to protect ... the interests of participants in employee benefit plans and their beneficiaries" by, inter alia, "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for ... ready access to Federal courts." 29 U.S.C. Sec. 1001(b) (1988). In an effort to achieve this purpose, Congress declined to adopt the traditional "reasonably prudent man dealing with his own property" standard for defining the scope of a fiduciary's duties. Rather, it intended that there be developed carefully tailored standards that (1) would vary depending on the capacity in which the fiduciary was acting and the expertise normally associated with that capacity, see 29 U.S.C. Sec. 1104(a)(1)(B) ("a fiduciary shall discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity ... would use in the conduct of an enterprise of a like character and with like aims"), and (2) would reflect a particular sensitivity to the need to protect pension rights, see 29 U.S.C. Sec. 1001(b) (goal of ERISA is "to protect ... the interests of participants in employee benefit plans and their beneficiaries"). Congress intended that the courts, in fashioning the appropriate principles, would develop a new body of federal common law.
 
 
 48
 The legislative history of ERISA makes plain that Congress intended this new federal common law to be uniform and predictable. The congressional reports, in explaining why Congress chose to codify such a fiduciary responsibility requirement rather than relying on traditional principles of trust law, repeatedly noted the importance of creating a consistent source of law to help fiduciaries, administrators, and plan participants predict the legality of the fiduciaries' actions. Thus, the House of Representatives report stated as follows:
 
 
 49
 [W]ithout ... access to the courts, and without standards by which a participant can measure the fiduciary's conduct he is not equipped to safeguard either his own rights or the plan assets. Furthermore, a fiduciary standard embodied in Federal legislation is considered desirable because it will bring a measure of uniformity in an area where decisions under the same set of facts may differ from state to state. It is expected that courts will interpret the prudent man rule and other fiduciary standards bearing in mind the special nature and purposes of employee benefit plans intended to be effectuated by the Act.
 
 
 50
 .... The uniformity of decision which the Act is designed to foster will help administrators, fiduciaries and participants to predict the legality of proposed actions....
 
 
 51
 H.R.Rep. No. 533, 93d Cong., 1st Sess. 12 (1973), reprinted in 1974 U.S.Code Cong. & Admin.News ("USCCAN") 4639, 4650. The Senate report was virtually identical. See S.Rep. No. 127, 93d Cong., 1st Sess. 29 (1973), reprinted in 1974 USCCAN 4838, 4865. The conference report on ERISA also noted that "[t]he conferees expect that the courts will interpret th[e] prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. 302 (1974), reprinted in 1974 USCCAN 5038, 5083.
 
 
 52
 Congress's effort to promote the development of a uniform federal common law is reflected principally in ERISA's provision that only federal courts, and not state courts, have jurisdiction over fiduciary-duty claims under ERISA. See 29 U.S.C. Sec. 1132(e)(1). In addition, Congress included a provision (a) requiring that in every ERISA action for breach of fiduciary responsibilities, a copy of the complaint must be served on the Secretary of Labor, and (b) allowing the Secretary to intervene in any such action. See 29 U.S.C. Sec. 1132(h). Both of these provisions further the goal of developing a uniform, consistent, and predictable body of ERISA fiduciary-responsibility law. This goal may well be frustrated with respect to fiduciary-duty claims against brokerage houses, however, if such claims are decided in arbitration. There are at least two reasons why this is so. First, a clear set of principles is unlikely to emerge since an arbitrator need not state any reasons for his decision. Second, judicial review of arbitration decisions is limited.
 
 
 53
 There is no general requirement that arbitrators of commercial disputes explain the reasons for an arbitration decision. See American Arbitration Association Commercial Arbitration Rule 42, reprinted in Alternative Dispute Resolution Techniques 2.042, 2.048 (1989) (requiring only that award itself be in writing). Nor do the American and New York Stock Exchanges require that arbitrators in securities disputes involving member firms give reasons for their decisions. See American Stock Exchange Rule 618(e) (requiring only that the award summarize the demands, the issues, and the results); New York Stock Exchange Rule 627(e) (same). Though public interest groups have urged that arbitration decisions resolving securities disputes be required to include written statements of the arbitrators' reasons for their decisions, the SEC has refused to require any such statement of reasons. See 54 Fed.Reg. 21,144, 21,151 (May 16, 1989) (SEC Order approving other proposed rule changes relating to securities arbitration). A decision without a stated rationale does little to develop the law, or to provide guidance for plan beneficiaries and fiduciaries, or to provide predictability as to the outcome of disputes. The SEC itself noted that in the absence of such statements "awards rendered by arbitrators in prior cases will not predict the vote or outcome of future cases." Id. at 21,152.
 
 
 54
 Further, in the absence of such statements, there will be no assurance that the arbitrators have followed whatever precedent there may be. And apparently, in the securities industry, they often do not. In 1988 congressional hearings on arbitration reform, a securities industry spokesman noted that arbitrators in the industry are regarded as being free to grant or deny awards without complying with applicable legal standards. See, e.g., Arbitration Reform: Hearings on H.R. 4960 Before the Subcomm. on Telecommunications and Finance of the Comm. on Energy and Finance, 100th Cong., 2d Sess. 85-86 (statement of Theodore Krebsbach, vice president and associate general counsel of Shearson Lehman Brothers). The spokesman stated that arbitrators frequently made decisions that did not reflect legal standards but rather sought to do rough justice: "A lot of times ... you don't say one person is 100 percent wrong or 100 percent right and you do what makes sense under the circumstances." Id. at 138. A member of the plaintiffs' bar concurred. See id. (statement of Theodore G. Eppenstein, Esq.) ("many times arbitration panels will split the baby[;] ... the way they split it, they will try to figure out how much the claimant has to pay his attorney and that will be the size of the award ...").
 
 
 55
 Finally, though judicial review of arbitration decisions is available, its scope is severely limited. The standard of review is highly relaxed, for such decisions may be set aside only for "manifest disregard" of "clearly governing legal principle[s]," not merely because of "an arguable difference regarding the meaning or applicability of laws." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933-34 (2d Cir.1986). And this standard is made even more difficult for the disappointed disputant to meet when the arbitrators have stated no reasons for their decision. Indeed, the SEC, in support of its decision not to require written opinions explaining arbitration awards, stated that such opinions would generally serve no purpose, since "[e]ven if awards contained errors of law, ... a mistake of law is not currently grounds for vacating an arbitration award." See 54 Fed.Reg. 21,14 4, 21,151 n. 45. Given the widespread use of arbitration clauses in brokerage firms' standard customer contracts, together with the lack of any requirement of a stated rationale in the arbitrators' decision and the very limited scope of judicial review, there is no likelihood that enforcement of such agreements will permit development of a carefully tailored, or uniform, or predictable body of law as to the fiduciary duties of brokers in dealing with ERISA pension plans.
 
 
 56
 In sum, I would conclude that broad-scale arbitration of ERISA fiduciary-responsibility claims would conflict with ERISA's goal of providing carefully tailored fiduciary duty principles and be antithetical to the goals of uniformity and predictability. Our prior ruling in the present case, holding the arbitration agreement unenforceable, was vacated by the Supreme Court and remanded for consideration in light of Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), see Shearson Lehman/American Express, Inc. v. Bird, --- U.S. ----, 110 S.Ct. 225, 107 L.Ed.2d 177 (1989), vacating and remanding 871 F.2d 292 (2d Cir.1989). Rodriguez did not alter the principle that arbitration agreements should not be enforced when there is an inherent conflict between arbitration and the statute's underlying purposes. I would uphold the district court's refusal to enforce the arbitration agreement here on the ground that there is an inherent conflict between arbitration and Congress's intention not to permit the resolution of ERISA fiduciary-duty disputes by the application of rough justice, ad hoc and sub silentio.