**Daniel KURZ, Plaintiff,**

v.

**CHASE MANHATTAN BANK USA, N.A., Defendant.**

**No. 03 CIV. 5678(WCC).**

United States District Court, S.D. New York.

May 24, 2004.

Zev Goldstein, P.C. (Zev Goldstein, Esq., Daniel L. Kurz, Esq., Of Counsel), Monsey, NY, for Plaintiff.

Simmons, Jannace & Stagg, L.L.P. (Thomas E. Stagg, Esq., Of Counsel), East Meadow, NY, for Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

·Plaintiff Daniel Kurz brings this action for statutory and actual damages against defendant Chase Manhattan Bank USA, N.A., alleging numerous violations of: (1) the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* and regulations promulgated thereunder; (2) the .Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666 *et seq.* and regulations promulgated thereunder; (3) the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* and regulations promulgated thereunder; and (4) the New York Credit Billing Act, N.Y. GEN. BUS. LAW §§ 701–07.[1] (Complt.¶¶ 9–10, 18–19, 25, 29, 31.) Plaintiff also alleges that defendant committed deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §§ 349–50, and breached the contract between them. (*Id.* ¶¶ 35–36.) Plaintiff's claims · arise from what ·he argues were unlawful actions taken by defendant, including the filing of counterclaims against him .in an action previously brought by plaintiff against defendant in this Court and taking other discriminatory actions in retaliation for bringing that suit. Defendant has moved for an ' order dismissing the action and compelling arbitration pur-

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

suant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2–4, 6. For the reasons stated herein, we grant defendant's motion to compel arbitration and transfer the action to the Court's suspense docket pending the disposition of the arbitration proceedings.

## BACKGROUND

Defendant is a federally chartered banking corporation with offices in New York. (Complt.¶ 3.) Plaintiff first opened the credit account at issue with Manufacturers Hanover Trust Company in the mid–1970s. (Kurz Affm. ¶ 2.) The account agreement at that time was entitled "Retail Installment Credit Agreement" and was governed by New York law (the "original agreement"). (*Id.* ¶ 3.) It further provided that any amendment or modification of the agreement "may apply to, and affect, amounts owed on the date the amendment or modification is effective as well as amounts due for Cash Advances or Purchases made subsequent to such date." (*Id.* ¶ 3 & Ex. A, ¶ 13.) Ultimately, following a series of bank mergers and credit agreement amendments over the next two decades, in 1996, plaintiff's account was converted into a Chase MasterCard account with defendant. (*Id.* ¶¶ 4–6.) Since that time, plaintiff has had something less than the widely-advertised "right relationship" with defendant, which resulted in a successful action brought by plaintiff and other individuals alleging numerous TILA, FCBA and ECOA violations that was tried before Judge McMahon of this Court in July 2003. (Complt.¶ 4.) In that action, defendant unsuccessfully asserted counterclaims against plaintiff for breach of contract, deceit and fraud, money had and received, conversion and unjust enrichment. (*Id.* ¶ 7.) Thereafter, plaintiff commenced the present action on July 28, 2003, alleging, *inter alia,* that the counterclaims were retaliatory and violated TILA,

FCBA, ECOA and New York statutes. Defendant has now moved to compel arbitration and dismiss the present action pursuant to an arbitration clause in the credit agreement between the parties. Additional facts will be set forth as necessary.

## DISCUSSION

### I. *Standard of Review*

The FAA provides, in relevant part: "A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA manifests "a 'liberal federal policy favoring arbitration agreements.'" *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Indeed, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24–25, 111 S.Ct. 1647. Therefore, even where an arbitration agreement requires the arbitration of disputes involving a federal statute, the parties to a valid arbitration agreement are compelled to arbitrate " 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum ....'" *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S.

614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

▪ The Second Circuit has enumerated the following factors to be considered when deciding whether to compel arbitration: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) whether Congress intended the plaintiff's statutory claims to be nonarbitrable; and (4) if not all claims are arbitrable, the court must determine whether to stay proceedings on the balance of the claims. *See Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 75–76 (2d Cir.1998) (citing *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 844 (2d Cir.1987)); *Bird v. Shearson Lehman/Am. Express, Inc.,* 926 F.2d 116, 118 (2d Cir.1991). In the present case, the parties' dispute centers only on the first and second considerations.

## II. *Whether the Parties Agreed to Arbitrate*

▪ Whether the parties agreed to arbitrate is determined by state contract law. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (noting that state law governs determination of whether parties agreed to arbitrate); *see also* 9 U.S.C. § 2 (an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). This inquiry raises the threshold question of which state's law of contracts applies in the present case.

### A. *Which State's Law Governs the Agreement?*

▪ Plaintiff appears to argue, albeit without benefit of any supporting legal analysis, that whether the parties agreed

to arbitrate their disputes should be resolved under New York law because he denies receipt of any notice amending the original agreement's choice-of-law provision to state that the agreement was governed by Delaware law. (Pl. Mem. Opp. Mot. Compel at 1–2.) Indeed, plaintiff's arguments about the enforceability of the arbitration clause are grounded in New York statutory and case law, and he does not address relevant Delaware law in his Memorandum. (*Id.* at 5–6.) Defendant argues in response that New York law does not apply because the choice-of-law provision in the cardholder agreement, mailed to plaintiff in and effective since 1996, expressly prescribes that the law of Delaware shall govern.[2] (Def. Reply Mem. Supp. Mot. Compel at 7–8.) Defendant also states that in the prior action between the parties, Judge McMahon concluded that Delaware law governed the parties' relationship, and argues that plaintiff is now estopped from arguing otherwise. (*Id.* at 7.)

We conclude that Delaware law governs this dispute because Judge McMahon's determination on this issue in the prior action is entitled to collateral estoppel effect and thus may not be relitigated before this Court. In the prior action, plaintiff was one of several named plaintiffs that brought claims against defendant alleging numerous violations of TILA, FCBA and N.Y. GEN. BUS. LAW §§ 703, 349–50. Defendant moved pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the plaintiffs' complaint for failure to state a claim. In ruling on that motion, Judge McMahon dismissed the plaintiffs' New York statutory claims with prejudice and concluded that they could not be sustained because "the credit

---

**2.** That choice-of-law clause provides: "This Agreement is governed by the laws of the United States and the State of Delaware. Any

dispute concerning any item in this Agreement will be resolved by those laws." (McGovern Aff., Ex. 2 at 6.)

agreement between plaintiffs and Chase identifies Delaware law as controlling," and "[a] state statutory claim cannot be sustained if another state's law governs the transaction." *Turk v. Chase Manhattan Bank USA,* No. 00 Civ. 1573, slip op. at 5 (S.D.N.Y. Feb. 16, 2001) (Def. Reply Mem. Supp. Mot. Compel, Ex. B.) In her order, she dismissed the plaintiffs' other claims with prejudice, although she granted them leave to replead claims arising under the FCBA. *Turk,* No. 00 Civ. 1573, at 4. Thereafter, plaintiffs repleaded the FCBA claims and prevailed on them at the subsequent bench trial. (Def. Reply Mem. Supp. Mot. Compel, Ex. A at 2–3.)

■ The Second Circuit has held that for the doctrine of collateral estoppel to apply, four elements must be satisfied:

(1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits.

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995).

■ We conclude that all four elements of this test are satisfied. The issue, namely which state's law governs claims arising under the credit card contract between plaintiff and defendant, is identical. The issue was litigated before and decided by Judge McMahon in the prior proceeding, and plainly is necessary to a merits determination in both the prior case and in this matter. Finally, plaintiff had a "full and fair opportunity" to litigate the choice-of-law issue in the prior proceeding as he could have, but elected not to avail himself of de novo appellate review of the Rule 12(b)(6) dismissal. *See, e.g., Gmurzynska*

*v. Hutton,* 355 F.3d 206, 210 (2d Cir.2004) (stating standard of review of Rule 12(b)(6) dismissals); *Grieve v. Tamerin,* 269 F.3d 149, 154 (2d Cir.2001) ("If [the plaintiff] wished to contend that the district court was wrong, his remedy was to appeal. When he failed to do so, the Southern District's decision became final and, by operation of collateral estoppel, conclusive on the issue ...."); *see also Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996) ("If a party has not had an opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue.... Hence, collateral estoppel will not bar reconsideration of an issue if there is an inability to obtain review or there has been no review, even though an appeal was taken." (citation omitted)). Thus, we now determine whether plaintiff agreed to arbitrate under Delaware law.

### B. *Whether There is An Agreement to Arbitrate*

Plaintiff argues that there is no agreement to arbitrate because he never received the arbitration amendment itself, there is inadequate proof of its mailing, and in any event he ceased using the account within a month of receiving the March 2002 monthly billing statement that contained a reference to the "new arbitration agreement." (Pl. Mem. Opp. Mot. Compel at 4–5.) Defendants contend in response that there is adequate proof of mailing and that continued charges on the account by plaintiff and his family after March 2002 constitute acceptance of the arbitration agreement under Delaware law. (Def. Reply Mem. Supp. Mot. Compel at 5–8.)

■ Before we address the parties' arguments with respect to the mailing and acceptance of the arbitration amendment,

we review the governing Delaware statute, which provides in relevant part:

> (a) Unless the agreement governing a revolving credit plan otherwise provides, a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to plan benefits or features, ... the manner for amending the terms of the agreement, *arbitration or other alternative dispute resolution mechanisms*, or other matters of any kind whatsoever. Unless the agreement governing a revolving credit plan otherwise expressly provides, any amendment may, on and after the date upon which it becomes effective as to a particular borrower, apply to all then outstanding unpaid indebtedness in the borrower's account under the plan, including any such indebtedness that arose prior to the effective date of the amendment. An agreement governing a revolving credit plan may be amended pursuant to this section regardless of whether the plan is active or inactive or whether additional borrowings are available thereunder. Any amendment that does not increase the rate or rates of periodic interest charged by a bank to a borrower under § 943 or § 944 of this title may become effective as determined by the bank, subject to compliance by the bank with any applicable notice requirements under the Truth in Lending Act (15 U.S.C. §§ 1601 *et seq.*), and the regulations promulgated thereunder, as in effect from time to time. *Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower.*

DEL. CODE ANN. tit. 5, § 952(a) (emphasis added). In order to effect a unilateral amendment pursuant to the statute, a bank must follow procedures that permit the borrower to opt-out by sending to the bank at a provided address written notice of the borrower's rejection of the amendment. *Id.* § 952(b)(1)-(2); *see also Edelist v. MBNA Am. Bank,* 790 A.2d 1249, 1257–58 (Del.Super.2001). The statute gives the borrower a minimum of fifteen days to give notice of rejection to the bank, and also provides that use of the account after that fifteen-day period constitutes acceptance, even if the borrower has provided notice of rejection. DEL. CODE. ANN. § 952(b)(2).

### 1. *Whether Plaintiff Received the Arbitration Amendment Notice*

Plaintiff argues that he is not bound by the arbitration amendment because he never received it, despite the mention of it in the March 2002 billing statement that defendant mailed to him. (Pl. Mem. Opp. Mot. Compel at 4–5.) We conclude that plaintiff did receive the arbitration amendment.

It is well settled that evidence of proper mailing gives rise to a rebuttable presumption of receipt. *See, e.g., Marsh v. First USA Bank, N.A.,* 103 F.Supp.2d 909, 918 (N.D.Tex.2000). Actual receipt need not be proven; as "[p]roof of mailing may be accomplished by presenting circumstantial evidence, including evidence of customary mailing practices used in the sender's business." *Id.* at 917–18 (crediting testimony of bank's vice president for operations about company's mass mailing process and quality assurance controls); *accord Fields v. Howe,* No. IP–01–1036–

C–B/S, 2002 WL 418011, at *5–6 (S.D.Ind. Mar. 14, 2002) (applying Delaware law and crediting vice president's testimony about mailing procedure); *Edelist,* 790 A.2d at 1254, 1258 (crediting testimony of bank vice president that amendment was sent to same address as bank statements and that it was not returned to sender as undeliverable); *Azriliant v. Eagle Chase Assocs.,* 213 A.D.2d 573, 575, 624 N.Y.S.2d 238 (2d Dep't) (discussing presumption and concluding that the presumption was not available in the absence of "sufficient evidence attesting to the mailing of the … letter itself, or to the 'existence of an office procedure geared to ensure the proper addressing or mailing of [correspondence]'" (alteration in original)), *leave to appeal denied,* 86 N.Y.2d 708, 658 N.E.2d 219, 634 N.Y.S.2d 441 (1995).

■■■ Plaintiff denies any recollection of receiving the arbitration amendment, and contends that defendant is not entitled to the presumption of receipt because it has not proffered sufficient evidence of proper mailing. (Pl. Mem. Opp. Mot. Compel at 4–5.) We disagree. Defendant has proffered the affidavit of Brian McGovern, a vice president in its marketing department, who described the operation of the "permanent message system" that defendant utilizes to track customer account activity, which includes mailings of notifications and agreements to the customers. (McGovern Aff. ¶¶ 3, 11.) McGovern averred that the message system indicated that a form notice numbered 25808 was to be sent to plaintiff on March 27, 2002. (*Id.* ¶ 11.) Form 25808 was the arbitration amendment notice at issue in this case. (*Id.*) McGovern stated that this notice was sent to plaintiff along with his March 2002 billing statement that had a payment due date of April 19, 2002. (*Id.* ¶ 12.) That statement itself contained a message in bold print advising plaintiff: "IMPORTANT: PLEASE READ ENCLOSED INSERT FOR NEW ARBITRATION AGREEMENT AND OTHER CHANGES TO YOUR ACCOUNT."[3] (McGovern Aff., Ex. 5; Kurz Affm., Ex. D.) McGovern stated that if plaintiff had elected to opt-out of the arbitration agreement, a message to that effect would appear on the first page of the permanent message system, which it does not. (McGovern Aff. ¶ 14.)

Defendant has proffered sufficient circumstantial evidence of mailing and is entitled to the presumption of receipt. Indeed, plaintiff does not ever actually deny receiving the agreement; he only states somewhat equivocally that "I don't believe I even received" it. (Kurz Affm. ¶ 20.) Moreover, plaintiff has conceded knowledge of the message on the statement about the arbitration agreement by stating that he reduced his own use of the account because of it.[4] (*Id.* ¶ 22.) Accordingly, we conclude that plaintiff, a practicing attorney clearly not unfamiliar with the laws

---

3. We note a discrepancy in appearance and form between the March 2002 statements provided by plaintiff and defendant. Both have the same balance due, minimum payment, dates and account number. Defendant's submission is one page, with the cautionary message directly below the account charges. Plaintiff's submission is two pages, and contains the message on the second page directly above the portion of the statement explaining how the finance charges were calculated. To give plaintiff the benefit of all doubts, we will analyze the language and structure of his submission.

4. Plaintiff avers that his last direct charge on the account was $5.02 at Pathmark on April 25, 2002 and that he arranged with EZ–Pass and his internet service provider to discontinue periodic preauthorized billings to the account in a timely manner. (Kurz Affm. ¶¶ 23–24.) Plaintiff states that the last such preauthorized charge was made on May 17, 2002. (*Id.* ¶ 24.)

governing consumer protection, received and therefore had ample notice of the arbitration amendment. We now turn to whether his subsequent actions evinced agreement with it.

### 2. *Whether Plaintiff Agreed to the Arbitration Amendment*

 Under DEL. CODE ANN. tit. 5, § 952, a credit card issuer seeking unilaterally to add an arbitration clause to the agreement must provide notice and an opt-out provision. *Edelist,* 790 A.2d at 1257–58. Failure to comply with the terms of the opt-out provision and continued charges to the account operate as acceptance of the arbitration amendment under Delaware law. *Id.* at 1258–59; *see also Marsh,* 103 F.Supp.2d at 919 (concluding that the plaintiffs were contractually bound by a mailed arbitration amendment when they did not follow the amendment's prescribed written opt-out procedure and continued to use their credit cards); *Joseph v. M.B.N.A. Am. Bank, N.A.,* 148 Ohio App.3d 660, 664, 775 N.E.2d 550 (2002) ("M.B.N.A. included an opt-out clause for [the plaintiff], but he did not use it. Consequently, he must be held to the amendment of the credit card agreement.").[5]

The arbitration amendment enclosed with the March 2002 statement concluded with an opt-out notice that provided in relevant part:

> The changes described in this Notice will not become effective if you send us a written letter that you choose not to accept them. You may choose not to accept the Arbitration Agreement section .... If the only choice you make is not to accept the Arbitration Agreement section, your Account will remain open.... In any event, we must receive your letter no later than April 25, 2002. In your letter, please include your name, address, account number and a statement that you do not want the Arbitration Agreement section ... to apply to your Account.... Your letter must be mailed to Chase Manhattan Bank USA, N.A., P.O. Box 15125, Wilmington, DE 19850–5125. We must receive your written letter by the time indicated and at the address indicated or your choice(s) will not be effective; it is not sufficient to telephone us....

(McGovern Aff., Ex. 4 at 11–12.) Plaintiff did not opt out in writing, and use of the account continued through July 31, 2002, with the billing statement dated August 27, 2002.

 We conclude that plaintiff agreed to the arbitration amendment because use of the credit card account continued through July 31, 2002, several months after the opt-out deadline passed. (McGovern Aff., Ex. 3.) Although plaintiff has averred that he stopped making direct charges to the account by April 25, 2002 and cancelled his periodic billings to the account, *see supra* note 4, his wife and daughter in Israel continued to make charges to the account as authorized users through July 31, 2002, several months after plaintiff received the March 2002 statement. (Kurz Affm. ¶¶ 22–24.) We, there-

---

**5.** We are not persuaded by plaintiff's reliance on *Myers v. MBNA Am.,* No. CV 00–163–M–DWM, 2001 WL 965063, at *3, 2001 U.S. Dist. LEXIS 11900, at *9 (D.Mont. Mar. 28, 2001) (quoting JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.18 (1993 & Supp. Fall 2000)), in support of the proposition that "an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it to do so." (Pl. Mem. Opp. Mot. Compel at 5.) The analysis in that opinion is of minimal import here because unlike *Edelist, Marsh* and *Joseph,* it does not address DEL. CODE ANN. tit. 5, § 952, or any other provision of Delaware law.

fore, reject plaintiff's contention that he never agreed to the arbitration amendment.[6] (*Id.* ¶ 25.) The continued charges by authorized users,[7] coupled with plaintiff's failure to submit to defendant the required written objection, evinces plaintiff's consent to the arbitration amendment. Had plaintiff objected to the arbitration provision, he easily could have complied with the opt-out clause and instructed his family as authorized users of the account to stop using it. Accordingly, we conclude that plaintiff is bound by the arbitration amendment.[8]

## III. *Whether Plaintiff's Claims Are Subject to Arbitration*

 Plaintiff next argues that his claims are not subject to arbitration under the plain language of the agreement because no single claim seeks more than $25,000. (Pl. Mem. Opp. Mot. Compel at 6–7.) The arbitration agreement provides in relevant part:

Any claim or dispute (*"Claim,"* which term may refer to more than one claim as· is appropriate for the context in which [it] is used) by either you or us against the other ... arising from or relating in any way to the Agreement, your credit card Account or the advertising, application or approval of your Account, will, at the election of either you or us, be resolved by binding arbitration. This Arbitration Agreement governs all Claims, whether such Claims are based on law, statute, contract, regulation, ordinance, tort, common law, constitutional provision, or any legal theory of law such as respondeat superior, or any other legal or equitable ground and

---

6. We note that even a cursory review of plaintiff's billing statements reveals post-April 25 charges to the account made in locales considerably closer to home than Israel, including, but not limited to purchases at Bed Bath & Beyond in Paramus, New Jersey on June 28, 2002 and Wesley Kosher in Spring Valley, New York on July 31, 2002. (McGovern Aff., Ex. 3.)

7. The Cardholder Agreement defines "you" as the applicant for the account, and "authorized user" as "any person to whom you have given permission to use your Account." (McGovern Aff., Ex. 2, ¶ 1.) It further provides in relevant part that:

You are responsible for all amounts owed on this Account, whether charged by you, a person who you permit to obtain credit on your Account ... or any other person using a Card or your Account with actual, implied or apparent authority. You agree that anyone who is issued a card for your Account ... is authorized to make charges to your Account to the same extent as you and we are not responsible for controlling such use of your Account. Such authority will continue until you revoke it by notifying us, obtaining the Card in your physical possession, and if it is a Card issued to an Authorized User, by also cutting it in half. (McGovern Aff., Ex. 2, ¶ 4.)

8. We reject plaintiff's contention that the arbitration amendment is printed in less than eight point font and is therefore, unenforceable per se under N.Y. C.P.L.R. § 4544 and *Filippazzo v. Garden State Brickface Co.,* 120 A.D.2d 663, 665–66, 502 N.Y.S.2d 258 (2d Dep't 1986). (Pl. Mem. Opp. Mot. Compel at 5–6.) We need not hold an evidentiary hearing to determine the size of the clause's print because: (1) the parties' contractual relationship is governed by the law of Delaware and the United States; and (2) state laws beyond the " 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' " including C.P.L.R. § 4544, invalidating arbitration clauses are preempted under the FAA. *See, e.g., Doctor's Assocs., Inc. v. Hamilton,* 150 F.3d 157, 163 (2d Cir.1998) (holding that to the extent New·Jersey case law "can be read to invalidate arbitral forum selection clauses in franchise agreements, it is preempted by the FAA"), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 867, 142 L.Ed.2d 769 (1999); *Tsadilas v. Providian Nat'l Bank,* N.Y.L.J., Feb. 22, 2004, at 8 (N.Y.Sup.Ct. Feb. 22, 2004) (concluding that the FAA precludes application of C.P.L.R. § 4544 to an arbitration clause).

whether such Claims seek as remedies money damages, penalties, injunctions or declaratory or . equitable relief. Claims subject to this Arbitration Agreement include Claims regarding the applicability of this Arbitration Agreement or the validity of the entire Cardmember Agreement or any prior Cardmember Agreement. *As used in this Arbitration Agreement, the term "Claim" is to be given the broadest possible meaning. Notwithstanding the foregoing, a Claim may be resolved by litigation and is not subject to arbitration under this Arbitration Agreement if (1) the only remedy that will be sought by either of the parties is monetary damages; (2). neither party will seek a recovery in excess of $25,000, excluding interest, costs and fees; and (3) the only parties to the litigation will be you and us.*

(McGovern Aff., Ex. 4, ¶ 2 (emphasis added).) Plaintiff argues that because he is willing to waive equitable relief and none of his individual claims is for more than $25,000 excluding interest, costs and fees,[9] they are not subject to arbitration.

Plaintiff's argument is contrary to the language of both the agreement and the purpose of the FAA. It is contrary to the agreement, which specifies that "claim" is to be given its broadest possible meaning and that it may refer to more than one possible claim. Moreover, acceptance of this argument would fly in the face of the FAA's " 'liberal federal policy favoring arbitration agreements,' " *Gilmer*, 500 U.S. at 25, 111 S.Ct. 1647, and the well established maxim that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927. Accordingly, we conclude that plaintiff's claims, all of which arise from or relate to his agreement with defendant and upon which a complete recovery would yield more than $50,000 in damages and penalties, must be resolved in the arbitral forum and we, therefore, grant the motion to compel arbitration. We deny, however, defendant's motion to dismiss plaintiff's Complaint and instead order the action transferred to this Court's suspense docket pending the disposition of the arbitration proceedings.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to compel arbitration is granted. Defendant's motion to dismiss plaintiff's Complaint is denied. This action is transferred to the Court's suspense docket pending the disposition of the arbitration proceedings. The parties are directed to proceed with arbitration as soon as is practicable.

SO ORDERED.

9. Plaintiff seeks the following amounts under the respective counts of the Complaint: (1) $10,000 maximum possible statutory penalty and maximum possible actual damages of $25,000; (2) $10,000 maximum possible statutory penalty and maximum possible actual damages of $1,000; (3) maximum possible statutory penalty of $1,000; (4) maximum possible statutory penalty and forfeiture of $3,000, plus maximum possible actual damages of $2,000; (5) $2,000 maximum possible statutory penalty and maximum possible actual damages of $2,000; (6) maximum possible statutory penalty of $450; and (7) maximum possible actual damages of $2,000. (Pl. Mem. Opp. Mot. Compel at 6–7.)