Schnabel v. Trilegiant Corp. & Affinion, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: April 4, 2012          Decided: September 7, 2012)

Docket No. 11-1311-cv

------------------------------------

LUCY SCHNABEL, EDWARD SCHNABEL, & BRIAN SCHNABEL,
o/b/o Themselves and All Others Similarly Situated

Plaintiffs-Appellee,

- v -

TRILEGIANT CORPORATION, AFFINION, INC.,

Defendants-Appellants.

------------------------------------

Before:   McLAUGHLIN, SACK, and LIVINGSTON, Circuit Judges.

Appeal from an order of the United States District Court for the District of Connecticut (Janet C. Hall, Judge) denying the defendants' motion to compel arbitration. The defendants argue on appeal, inter alia, that the district court erred in concluding as a matter of law that the parties had not mutually assented to a valid arbitration provision and that this Court should remand the case to the district court directing the court to enter an order compelling arbitration. We conclude that there is no genuine issue of material fact which, if decided in the defendants' favor, would be sufficient to support a fact-

finder's determination that the parties agreed to arbitrate the dispute.

Affirmed.

PATRICK A. KLINGMAN (James E. Miller, Karen M. Leser-Grenon, James C. Shah, Nathan C. Zipperian, Rose F. Luzon Shepherd, Finkelman, Miller & Shah LLP, Media, PA, Chester, CT, San Diego, CA David A. Burkhalter, Burkhalter, Rayson & Assoc. P.C., Knoxville, TN, on the brief) for Plaintiffs-Appellees.

KENNETH M. KLIEBARD (Gregory T. Fouts, Morgan Lewis & Bockius LLP, Chicago, IL James H. Bicks, Wiggin and Dana LLP, Stamford, CT, on the brief) for Defendants-Appellants.

SACK, Circuit Judge:

The question presented to us on this appeal is whether the plaintiffs are bound to arbitrate their dispute with the defendants as a consequence of an arbitration provision that the defendants assert was part of a contract between the parties. Neither of the plaintiffs acknowledge being aware of the existence of the arbitration provision when their contractual relationships with the defendants were formed. But, according to the defendants, the provision was made available to the plaintiffs through a hyperlink appearing on the page the plaintiffs would have seen before enrolling in a service offered by the defendants and an email sent to the plaintiffs after their enrollment.

We conclude that despite some limited availability of the arbitration provision to the plaintiffs, they are not bound

2

to arbitrate this dispute.  As regards the email, under the contract law of Connecticut or California -- either of which may apply to this dispute -- the email did not provide sufficient notice to the plaintiffs of the arbitration provision, and the plaintiffs therefore could not have assented to it solely as a result of their failure to cancel their enrollment in the defendants' service.  As regards the hyperlink, we conclude that the defendants forfeited the argument that the plaintiffs were on notice of the arbitration provision through the hyperlink by failing to raise it in the district court.

## BACKGROUND

Because this appeal comes to us from the district court's denial of the defendants' motion to compel arbitration, we accept as true for purposes of this appeal factual allegations in the plaintiffs' complaint that relate to the underlying dispute between the parties.  Fensterstock v. Educ. Fin. Partners, 611 F.3d 124, 127-28 (2d Cir. 2010), vacated on other grounds by Affiliated Computer Servs., Inc. v. Fensterstock, 131 S. Ct. 2989 (2011).  Allegations related to the question of whether the parties formed a valid arbitration agreement -- a question the district court answered in the negative -- are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial. See Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the

Federal Arbitration Act . . . , the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." (citations omitted)); Specht v. Netscape Commc'n Corp., 306 F.3d 17, 27 n.12 (2d Cir. 2002) (similar). As it relates to the question of whether an arbitration agreement was formed, we interpret the record as a whole in the light most favorable to the defendants, the party against whom the district court resolved the motion to compel arbitration. Cf., e.g., Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011) (observing that the district court's decision to grant summary judgment is reviewed de novo, "construing the evidence in the light most favorable to the party against which summary judgment was granted").

### Underlying Dispute

Lucy Schnabel, Edward Schnabel, and Brian Schnabel, are the named plaintiffs in this putative class action. Lucy and Edward are married to one another. Brian is their son. All three are residents of Pleasant Hill, California.

The defendants Affinion Group, LLC, and its wholly owned subsidiary Trilegiant Corp., are incorporated in the State of Delaware with their principal places of business in Connecticut. Trilegiant is in the business of marketing and selling online programs that offer discounts on goods and services in exchange for a "membership fee." The plaintiffs

4

allege that the fee ranges from $8.99 monthly (about $108 annually) to $480 annually.  <u>See</u> Class Action Compl. at ¶ 22, <u>Schnabel v. Trilegiant Corp.</u>, 10-cv-00957 (D. Conn. June 17, 2010), ECF No. 1 ("Compl.").

"Great Fun" is the name of one of Trilegiant's services.[1]  By paying a monthly membership fee to Trilegiant, Great Fun members are eligible to receive discounts on a wide variety of products and services including dining, retail shopping, car repair, and travel.

In 2007, Brian Schnabel was enrolled in Great Fun after making a purchase on the online travel site Priceline.com.  In 2009, his father, Edward Schnabel, was enrolled in Great Fun after making a purchase on the sports memorabilia site Beckett.com.[2]  Neither Edward nor Brian acknowledges

---

[1]  The Schnabels bring this suit on behalf of all persons who, after February 15, 2008, were charged for one or more Trilegiant services.  <u>See</u> Compl. at ¶ 33-34.  In addition to Great Fun, these services include Shoppers Advantage, a "catalog and on-line shopping membership"; Travelers Advantage, a "travel services membership"; AutoVantage, an "automobile purchasing information, dealer referral, and discount auto repair membership"; Buyers Advantage, a "retail product warranty extension/product repair membership"; Privacy Guard, a "credit report and credit monitoring membership"; Health Saver, a "dentist referral and discount prescription drug/medical services membership"; and Netmarket.com, a "catalog and online shopping membership."  <u>See</u> <u>id.</u> at ¶ 22.

[2]  A "screenshot" of an order confirmation page similar to the Beckett Internet page that Brian saw when completing his purchase on Beckett, including the Great Fun solicitation "10% Cash Back" is publicly available at <u>http://www.ca2.uscourts.gov/Docs/Video files/11 1311/Becket ord c onf.pdf</u>.  <u>See also</u> Ex. A to Mallozzi Aff., Ex. 1 to Mot. to Dismiss or Stay and Compel Arbitration, <u>Schnabel v. Trilegiant Corp.</u>, 10-cv-00957 (D. Conn. Sept. 29, 2010), ECF No. 23

intentionally or knowingly enrolling in the service.  Trilegiant asserts, and we accept for the purposes of this appeal, however, that in the process of completing purchases from Priceline.com and Beckett.com, respectively, both Edward and Brian were enrolled in Great Fun when they were presented with separate "enrollment offer" pages and entered personal information into fields on those pages.[3]  See Appellant's Brief 6-7.

The initial Great Fun solicitation, which appears on the merchant's order confirmation page confirming that the user

---

("Mallozzi Aff.").

The screenshots in the record, and made available on the Court's website, see id. & infra note 3, were created by Trilegiant and are substantially similar to the Internet pages that Edward and Brian would have seen when enrolling in Great Fun.  See Mallozzi Aff. ¶¶ 6, 10.  All of the screenshots posted to the Court's website refer to "Daniel J Eid" as the purchaser of Beckett goods and the person enrolling in Great Fun.  Although Trilegiant does not explain Mr. Eid's relationship with Trilegiant, he appears to be a Trilegient or Affinion employee inasmuch as his email address (disclosed in the record in an example email allegedly similar to one received by Edward and Brian after their enrollments in Great Fun, Mallozzi Aff. ¶ 15) has an "affinion.com" domain.  See Mallozzi Aff. Ex. E.

[3] Screenshots similar to the enrollment offers to Edward and Brian are publicly available at http://www.ca2.uscourts.gov/Docs/Video_files/11_1311/Priceline_en rol_offer.pdf, see also Mallozzi Aff. Ex. A., and http://www.ca2.uscourts.gov/Docs/Video_files/11_1311/Becket_enrol _offer.pdf, respectively; see also Mallozzi Aff. Ex. C.

Both Edward and Brian dispute that they in fact completed all the steps said to be necessary to enroll in Great Fun when they were making their respective purchase.  Edward asserts that at the time, he thought that Beckett.com was collecting his information and was unaware that any other entity was involved in the transaction.  Brian says that, like Edward, he did not realize that this solicitation involved a third-party separate from Priceline.  But Trilegiant has a record of Brian subscribing to their service under the username "SCHNABEL22."

has completed an online purchase, invites the purchaser to click on a hyperlink in order to receive "Cash Back" on his or her purchase. Although the plaintiffs allege that the order confirmation page does not indicate that this offer involves a party other than the merchant with whom the user is in the process of completing a purchase, a screenshot of a confirmation page allegedly similar to that viewed by Edward does (1) state that "your Online Price Guide subscription has also been sent to [your email address]"; and (2) feature, below the hyperlink "Click here to claim up to $20.00 Cash Back on this purchase!", a "button" titled "See Details" with a legend beneath reading: "Click above to learn how to get $20 Back from Great Fun." See Screenshot, citation in footnote 2, supra. "Great Fun" is not further identified on the order confirmation page.

According to Trilegiant, Edward would only have been brought to Great Fun's enrollment page after clicking on the hyperlinked invitation to "See Details," and Brian after clicking on a similar invitation to "Learn More," posted on the purchase confirmation pages of the Beckett and Priceline sites, respectively. See Mallozzi Aff., Ex. 1 to Mot. to Dismiss or Stay and Compel Arbitration, Schnabel v. Trilegiant Corp., 10-cv-00957 (D. Conn. Sept. 29, 2010) ("Mallozzi Aff.") ¶¶ 6, 10.[4]

---

[4] It is not clear from the record whether Edward and Brian would have had to click on these hyperlinks in order to enroll in Great Fun or whether they could have been enrolled in Great Fun without ever seeing the enrollment pages by, for example, in Edward's case, clicking on the "Click here to claim up to $20.00 Cash Back on this purchase!" hyperlink. Because we conclude that

7

According to Trilegiant, neither plaintiff could join Great Fun without affirmatively entering personal information into various fields appearing on the enrollment page. This information included the plaintiff's "city of birth," and a password created by the plaintiff. It is undisputed, though, that the plaintiffs were not required to reenter credit-card information when signing up for Great Fun. That information had already been entered in connection with the online purchase of goods and services through Beckett (for Edward) and Priceline (for Brian).

The enrollment page, like the original purchase confirmation page, does not plainly indicate that the offer is from a third party -- Trilegiant -- rather than the merchant with whom the user has just completed a purchase -- Beckett or Priceline. Indeed, in the case of the enrollment page for Beckett, there is a statement at the top of the page indicating that the purchaser has received a "Special Award for Beckett Customers." See Mallozzi Aff. Ex. A. Toward the bottom of the page, near an overview of some of the "Benefits" of the program, though, there do appear the logos of several popular brands besides Beckett, suggesting that by accepting the offer, the purchaser will somehow be able to receive discounts when purchasing other goods or services.

---

even if Edward and Brian did both see the enrollment pages, no binding arbitration agreement was formed, this question need not be resolved.

The message on the enrollment page also promises "up to" $20 off on the purchaser's Beckett purchase, along with several benefits for other goods and services, including "10% to 50% [savings] at over 40,000 Participating Restaurants" and "10% to 50% [savings] on Top Attractions and Activities." Id. It indicates in relatively small print that Great Fun will email the purchaser "Great Fun membership information so [he or she] can start saving today," but that "[t]here's no obligation to continue . . . Great Fun benefits. . . . [The purchaser can] call us to cancel before the end of . . . [the] FREE trial and owe us nothing[.]" Id.

To the left of the fields where a purchaser can enter his or her "City of Birth" and password appears a two paragraph description of some of the general terms of the agreement, including a statement that the first month of membership will be free but that the purchaser's credit card will be charged $14.99 per month if he or she does not cancel the membership by toll-free phone call. Id. The text also states that by entering his "City of Birth" and password and clicking the "Yes" button, the purchaser agrees that the vendor (in this case Beckett) will transmit his or her credit-card information to Great Fun. Id. Further, by clicking the "Yes" button, the purchaser acknowledges that he or she has read the "Terms & Conditions" of the agreement. Id.

Below these paragraphs are two hyperlinks. One is to a "Privacy Policy," and the other is to "Terms & Conditions" --

9

apparently referring to those mentioned in the preceding paragraph. Id. Trilegiant suggests, in its briefing to us, that by clicking on the "Terms & Conditions" hyperlink, purchasers such as Edward and Brian would be brought to a page that includes many other terms, including the arbitration provision at issue in this litigation. See Appellant's Br. 36; Appellant's Reply Br. 13-14.

Trilegiant also asserts that it was its custom and practice, to which it routinely adhered, to email to each newly enrolled member a written document entitled "Great Fun Membership Terms and Conditions" following his or her online enrollment in the service. If the email bounced back, then Trilegiant would send a paper version of the document to the member at his or her billing address.

Edward Schnabel acknowledges that after learning of Trilegiant's practice, he reviewed his old emails and determined that in fact he had received "several emails" from Great Fun. Ex. 1 to Opp. to Mot. to Dismiss or Stay and Compel Arbitration, Edward Schnabel Decl. ¶ 7, Schnabel v. Trilegiant Corp., 10-cv-00957 (D. Conn. Oct. 19, 2010), ECF No. 24 ("Edward Schnabel Decl."). Brian, on the other hand, denies ever having received an email from Great Fun. Because we conclude that even if Brian and Edward received the terms and conditions, including the arbitration provision, by email, the terms did not form a part of a binding agreement between the parties, the factual dispute

10

among the parties as to whether these emails were ever received by the plaintiffs is immaterial for present purposes.

The arbitration provision states that any dispute between the member and "GF" –- or Great Fun[5] – can be brought in either "small claims court or by binding arbitration."  Edward Schnabel Decl., Ex. A ¶ 5.  It also includes a class-arbitration waiver providing that "[a]ll disputes in arbitration will be handled just between the named parties, and not on any representative or class basis."  Id.  The same provision also requires that all disputes between the parties should be governed by Connecticut law.  Id.

In early 2010, Edward Schnabel and his wife Lucy Schnabel discovered that Edward's credit card had been charged $14.99 per month for every month between September 2009 and February 2010 for Edward's membership in Great Fun.  He never made any allegedly discounted purchases for which we was qualified as a Great Fun member.  Instead, he asked for a full refund of the charges.  Trilegiant offered to refund four of the six months of charges, but no more.

---

[5]    The first provision in the "Terms & Conditions" document begins: [T]he "AGREEMENT [is] made between Trilegiant . . . providing a service called Great Fun, called 'GF,' and the person specified on the GF membership card."  Edward Schnabel Decl., Ex. A.  The plaintiffs argue that "[b]y its express language, the arbitration provision does not apply to disputes between consumers and Trilegiant, but rather disputes between consumers and GF."  Appellees' Br. at 22.  Because we conclude that the arbitration agreement would not bind the plaintiffs even if it were to "express[ly]" refer to Trilegiant, we need not address this argument.

11

In March or April of that year, Lucy Schnabel pointed out to her son Brian that he had similarly been charged $11.99 per month since December 2007 by Trilegiant for membership in Great Fun.  Brian asserts that he then called Great Fun to complain.  In response, he says, Trilegiant offered to refund four of the thirty months of charges.

### District Court Proceedings

On July 17, 2010, the plaintiffs brought suit against Trilegiant and Affinion in the United States District Court for the District of Connecticut on behalf of a class of themselves and similarly situated plaintiffs.  They alleged, inter alia, that the defendants had engaged in "unlawful, unfair, and deceptive practices [through] . . . unauthorized enrollment practice[s] [known as] . . . 'post transaction marketing' and 'data pass.'"  Compl. at ¶ 2-3.

According to the plaintiffs, "data pass" occurs when a consumer agrees to pay a third-party service without having to reenter credit card or other payment data initially entered in order to purchase a good or service from a different online merchant.  Id. at ¶ 4.  "Post transaction marketing" occurs when "(1) 'interstitial sales' offer pages, which appear between the checkout page and the confirmation page of the e-retailer from whom the consumer intends to make a purchase, (2) 'pop-up' windows, which appear on top of the confirmation page, and (3) hyperlinks or 'banners' that are included directly on the confirmation page itself."  Id. at ¶ 3.  Central to the factual

12

allegations of the plaintiffs' complaint was a United States Senate investigation into these allegedly unfair practices. See Compl. at ¶¶ 3-5.

The complaint asserted claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, the Electronic Communications Privacy Act, 18 U.S.C. § 2510, the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110a, the California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, the California False Advertising Law, id. at § 17500, and the California Unfair Competition Law, id. at § 17200. Compl. at ¶¶ 43-103. On September 29, 2010, the defendants filed a motion to dismiss and compel arbitration pursuant to the emailed arbitration provision. On February 24, 2011, the district court (Janet C. Hall, Judge) denied the motion to compel arbitration, concluding that the parties had never agreed to arbitrate. Schnabel v. Trilegiant Corp, 10-CV-957, 2011 WL 797505, at *6, 2011 U.S. Dist. LEXIS 18132, at *20-*21 (D. Conn. Feb. 24, 2011).

The district court began its analysis by deciding that the court was not required to resolve a complex choice-of-law question -- whether California or Connecticut law applied -- because "regardless of the law applied, the result is the same." Id. at *3, 2011 U.S. Dist. LEXIS 18132, at *7-*8. Under either law, the court determined, the defendants had failed to raise a genuine issue of material fact as to whether the plaintiffs had assented to the arbitration provision. Id. at *4, 2011 U.S.

13

Dist. LEXIS 18132, at *15.  "Even assuming Edward and Brian read all of th[e] information [on the enrollment screen and in the subsequent email from Great Fun], the contract that they formed with Trilegiant did not include an arbitration clause."  Id., 2011 U.S. Dist. LEXIS 18132, at *13.  In the district court's view, the contract was formed at the moment the plaintiffs entered their information into the online enrollment screen and "included terms exactly as Trilegiant proposed them in their prompts -- a monthly charge in exchange for online savings."  Id. The court concluded that Brian and Edward never expressly or implicitly assented to additional terms, which included the arbitration provision, which were to follow by email.  Id.

The defendants filed this interlocutory appeal pursuant 9 U.S.C. § 16(a)(1)(C)[6] from the order denying their motion to dismiss and compel arbitration.

**DISCUSSION**

I. Standard of Review and Legal Framework

The Supreme Court has repeatedly instructed that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., first enacted in 1925, "embod[ies] a national policy favoring arbitration."  AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1749 (2011) (internal quotation marks and brackets omitted).

---

[6]  9 U.S.C. § 16(a)(1)(C) provides, inter alia: "An appeal may be taken [to the Court of Appeals] from an order denying an application under section 206 of this title to compel arbitration."

14

But this policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes. With the FAA, Congress sought to counteract an historic judicial hostility toward arbitration, which often trumped the parties' clear intentions. See Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 272 (1995). The Act places arbitration agreements "upon the same footing as other contracts." Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) (internal quotation marks omitted). But it "does not require parties to arbitrate when they have not agreed to do so." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989); accord E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293 (2002).

The threshold question facing any court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate. Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate, the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator. See AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648-49 (1986); Specht, 306 F.3d at 26-27.

Under the FAA, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. But a trial is warranted only if there

15

exists one or more genuine issues of material fact regarding whether the parties have entered into such an agreement. See Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 369 (2d Cir. 2003).

On appeal, a district court's denial of a motion to compel arbitration is reviewed de novo. Specht, 306 F.3d at 26. The question of whether the parties have agreed to arbitrate is also reviewed de novo to the extent that the district court's conclusion was based on a legal determination, but findings of fact, if any, bearing on this question are reviewed under a "clearly erroneous" standard. Id.[7]

II. State Contract Law

Whether or not the parties have agreed to arbitrate is a question of state contract law. See Specht, 306 F.3d at 26; Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 295-96 (2d Cir. 1999) ("[W]hile . . . the FAA preempts state law that treats arbitration agreements differently from any other contracts, it also preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate.") (internal quotation marks and footnote omitted).

The terms and conditions at issue here include a choice-of-law provision, which -- like the arbitration clause -- was not shown on the enrollment screen. The provision therefore

---

[7]  There are no such findings of fact by the district court that we review or rely upon on appeal here.

16

does not determine the law that the Court should apply to determine whether the arbitration clause was part of any agreement between the parties unless and until it is determined that the parties have agreed to and are bound by it.  Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.  See, e.g., Trans-Tec Asia v. M/V Harmony Container, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); B-S Steel of Kansas, Inc. v. Texas Indus., Inc., 439 F.3d 653, 661 n.9 (10th Cir. 2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid").

Considering this matter without deciding whether the choice-of-law provision is binding, then, the law of either California -- where the Schnabels were located when they were enrolled in Great Fun -- or Connecticut, where Trilegiant is located -- may apply to this dispute.  But as the district court recognized, neither that court nor this one need resolve this typically thorny choice-of-law question, because both Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term. Schnabel, 2011 WL 797505, at *3, 2011 U.S. Dist. LEXIS 18132, at

17

*7-*8. Which state's law applies is therefore without significance.

The touchstone of the inquiry under either state's law is the parties' outward manifestations of assent. See, e.g., Chicago Title Ins. Co. v. AMZ Ins. Servs., Inc., 188 Cal. App. 4th 401, 422, 115 Cal. Rptr. 3d 707, 725 (2010) ("Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties.") (internal quotation marks omitted); Binder v. Aetna Life Ins. Co., 75 Cal. App. 4th 832, 850, 89 Cal. Rptr. 2d 540, 551 (1999) ("To form a contract, a manifestation of mutual assent is necessary. . . . Mutual assent may be manifested by written or spoken words, or by conduct.") (citations to Restatement (Second) of Contracts §§ 17, 19 (1981) omitted); Ubysz v. DiPietro, 185 Conn. 47, 51, 440 A.2d 830, 833-34 (1981) (observing that a contract is formed when parties assent through "written or spoken words or by other acts or by failure to act") (internal quotation marks omitted).

The conduct manifesting such assent may be words or silence, action or inaction, but "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know[8] that the

---

[8]
> A person has reason to know a fact, present
> or future, if he has information from which a
> person of ordinary intelligence would infer
> that the fact in question does or will exist.
> A person of superior intelligence has reason
> to know a fact if he has information from
> which a person of his intelligence would draw
> the inference. There is also reason to know

18

other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19(2).

In this case, Trilegiant, in the argument it has not forfeited, asserts that the plaintiffs assented to the arbitration provision by enrolling in Great Fun, receiving the emailed terms, and then not cancelling their Great Fun memberships during the free trial period. As we explained at length in Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004), the mere acceptance of a benefit -- and we assume here that membership in Great Fun, without the use of any of its discounts, is a benefit in itself -- may constitute assent, but only where the "offeree makes a decision to take the benefit with knowledge [actual or constructive] of the terms of the offer . . . ." Id. at 403. As Professor Williston's treatise observes, "one who accepts the benefit of services rendered may be held to have impliedly made a promise to pay for them . . . [if] the offeree . . . knew or had reason to know that the party performing expected compensation." 2 RICHARD A. LORD, WILLISTON ON CONTRACTS § 6:9 (4th ed. 1991); see also Specht, 306 F.3d at 29-30 (citing Windsor Mills, Inc. v. Collins & Aikman Corp., 25 Cal.

---

> if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

Restatement (Second) of Contracts § 19(2), Illus. b.

19

App. 3d 987, 992, 101 Cal. Rptr. 347, 351 (1997) ("[W]hen the offeree does not know that a proposal has been made to him this objective standard does not apply.")).

Therefore, in cases such as this, where the purported assent is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue. In other words, where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on <u>inquiry</u> notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent. "Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." <u>Specht</u>, 306 F.3d at 30 n.14 (internal quotation marks omitted). In making this determination, the "[c]larity and conspicuousness [of the term is] important . . . ." <u>Id.</u> at 30.

Edward and Brian assert that they were not on actual notice of the arbitration provision, and Trilegiant cannot point to any evidence in the record upon which a jury could rely to conclude otherwise. The questions we must address, then, are whether the plaintiffs were on inquiry notice of the arbitration provision through the emails sent after their enrollments and, if so, whether their conduct in enrolling in Great Fun, and then not cancelling their memberships before the free trial period expired, constituted an objective manifestation of their assent to the arbitration provision.

III. Analysis

Trilegiant does not dispute (as, of course, it cannot) that the arbitration provision does not appear on the pages that either of the plaintiffs would have first encountered during his enrollment in Great Fun. It argues, however, that the plaintiffs were put on notice of the provision, and thus were in a position to assent to it both through the "terms and conditions" hyperlink on the enrollment form available before enrollment, and through the email sent to each plaintiff after his enrollment.

A. The Email

The issue preserved on appeal[9] is the second of those: whether the plaintiffs were put on inquiry notice of the arbitration provision through the transmission of the terms by email after the initial enrollment and then assented to this provision by failing to cancel their Great Fun memberships after the expiration of the free-trial period.

1. Timing of Contract Formation. "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." 1 WILLISTON ON CONTRACTS § 4:16. An offer -- and all of its terms -- therefore ordinarily precede acceptance.

Trilegiant nonetheless asserts that the plaintiffs assented to terms emailed to them after the plaintiffs enrolled

---

[9] See section III.B, infra, concluding that the defendants argument that the "terms and conditions" hyperlink gave the defendants requisite notice has been forfeited because it was not raised in the district court.

in Great Fun.  And indeed there are cases -- Trilegiant argues that this is one -- where terms are effectively added to an agreement at the instance of the offeror subsequent to the establishment of a contractual relationship.  The conventional chronology of contract-making has become unsettled over recent years by courts' increased acceptance of this so-called "terms-later" contracting.  See generally John E. Murray, Jr., The Dubious Status of the Rolling Contract Formation Theory, 50 DUQ. L. REV. 35 (2012) ("Murray");  Eric A. Posner, ProCD v. Zeidenberg and Cognitive Overload in Contractual Bargaining, 77 U. CHI. L. REV. 1181, 1184 (2010) ("Posner").

There are at least two analytical approaches available to Trilegiant to argue that despite the time sequence here and its divergence from the typical offer-with-all-terms-then-acceptance progression, the parties entered into a contract that included the arbitration provision emailed to each plaintiff after his enrollment.

First, Trilegiant might contend that the arbitration clause became effective after the plaintiffs received the terms-and-conditions email and then assented to the offer by not cancelling their Great Fun memberships.  This conception of the parties' dealing is similar to the theory undergirding conventional shrinkwrap-license cases.

22

In shrinkwrap-license cases, the terms at issue are typically provided inside the packaging of consumer goods.[10] Whether or not there is notice to the consumer on the outside of the packaging that terms await him or her on the inside, courts have found such licenses to become enforceable contracts upon the customer's purchase and receipt of the package and the failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions of the contract included with the product. See Hill v. Gateway 2000, Inc., 105 F.3d 1147, 1150 (7th Cir. 1997); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1448-49 (7th Cir. 1996); see also Posner, 77 U. Chi. L. Rev. at 1184 ("[T]he 'offer' was not 'you may have the product if you pay now,' but 'you may have the product if you pay now and use it later.'"). As we explained in Register.com, "in the shrinkwrap context, the consumer does not manifest assent to the shrinkwrap terms at the time of purchase; instead, the consumer manifests assent to the terms by later actions." 356 F.3d at 428. In this case the "later actions" would be not the failure

---

[10]   "Shrinkwrap licenses" derive their name from the plastic used to seal many consumer products called shrinkwraps. Shrinkwraps are created by stretching polymers out straight and making them into plastic film. When the film is placed around an object and heated, the polymers return to their natural tangled state and the sheet shrinks, sealing in the object. These "shrinkwraps" are considered relatively tamper proof, moisture proof and resistant to light damage. See "How Does Shrink Wrap Work," eHow, http://www.ehow.com/how-does_4659120_shrink-wrap-work.html (last visited July 25, 2012). Shrinkwraps are, of course, ubiquitous.

to return goods but the failure to cancel the Great Fun membership after receipt of the email.

Alternatively, the plaintiffs' initial enrollment in Great Fun may be seen, as the district court saw it, to be the formation of an agreement for each of them to pay a specified monthly fee in exchange for the membership benefits offered by Great Fun. See Schnabel, 2011 WL 797505, at *4, 2011 U.S. Dist. LEXIS 18132, *13 ("By the time Edward and Brian received an email from Trilegiant, any contract had already been formed."). The arbitration provision and other additional terms contained in the email would then be proposed amendments to that existing contract. According to Trilegiant, the emailed terms would have been accepted by the plaintiffs' acts of continued payments of fees on their credit cards and maintenance of the opportunity to make use of Great Fun -- or, put otherwise, their failure to cancel the service in a timely manner.[11]

The two approaches -- amendment and terms-later contract, like in the shrinkwrap approach -- differ with respect

---

[11] In support of that approach, Trilegiant points to cases in which courts have held that arbitration provisions were added as amendments to pre-existing agreements when the provisions were sent to the offeree after contract formation and the offeree maintained his or her relationship with the offeror. See, e.g., Walters v. Chase Manhattan Bank, No. CV-07-0037, 2008 WL 3200739, at *3, 2008 U.S. Dist. LEXIS 60675, *7-*9 (E.D. Wash. Aug. 6, 2008); Milligan v. Comcast Corp., 06-cv-00809-UWC, 2007 WL 4885492, at *2-*3, 2007 U.S. Dist. LEXIS 96377, at *6-*7 (N.D. Ala. Jan. 22, 2007); Kurz v. Chase Manhattan Bank USA, N.A., 319 F. Supp. 2d 457, 463 (S.D.N.Y. 2004); MBNA Am. Bank N.A. v. Bailey, No. CV044001079S, 2005 WL 1754881, at *2, 2005 Conn. Super. LEXIS 1611, at *4-*6 (Conn. Super. Ct. May 25, 2005).

to the timing of contract formation: when the consumer enrolls, using the first approach, and when the consumer receives the terms and fails to cancel the service in the second. But this distinction is ultimately of little importance here.[12] We need not determine when the agreement between the parties was formed, for we conclude that the later-emailed terms, including the arbitration clause, were in any event never accepted by either plaintiff.[13]

---

[12] The enrollment page does not include an "incorporation clause" incorporating into the contract any terms that may follow by email. Cf. 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:25 (4th ed. 1991) ("[T]he parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document . . . including a separate document which is unsigned."); Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 48 (2d Cir. 1993) ("[W]e have held that a broadly-worded arbitration clause which is not restricted to the immediate parties may be effectively incorporated by reference into another agreement."). We therefore need not decide whether such an incorporation clause could indeed bind the offeree to later-communicated terms unknown and effectively unknowable by the offeree at the time the offer was accepted.

[13] Trilegiant, attempting to use the amendment model, may be required to clear an additional hurdle: the requirement, according to some authorities, that the amendment to a contract be supported by separate and additional consideration. See, e.g., Lamb v. Emhart Corp., 47 F.3d 551, 559 (2d Cir. 1995) (Under Connecticut law, "[a]dditional consideration is required for modifications when the changes constitute a new agreement bargained for by the parties. The additional consideration is required as evidence that the parties have in fact bargained for and agreed upon what is essentially a new contract."). There is, however, some authority for the proposition that arbitration agreements do not require additional consideration because "either party may elect arbitration, [and therefore such] clauses are mutual." Zawikowski v. Beneficial Nat'l Bank, No. 98 C 2178, 1999 WL 35304, at *2, 1999 U.S. Dist. Lexis 514, at *7 (N.D. Ill. Jan. 7, 1999) (discussing whether an arbitration clause in a new agreement could cover disputes arising under an old agreement). "Often, consideration for one party's promise to arbitrate is the

2.  Notice.  A person can assent to terms even if he or she does not actually read them, but the "offer [must nonetheless] make clear to [a reasonable] consumer" both that terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent.  Specht, 306 F.3d at 29; see also, e.g., Guadagno v. E*Trade Bank, 592 F. Supp. 2d 1263, 1271 (C.D. Cal. 2008); Murray, 50 Duq. L. Rev. at 49 (citing Hill, 105 F.3d at 1148, for the proposition that "people who accept an offer assume the risk of unread terms that may prove unwelcome").  "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious."  Windsor Mills, Inc. v. Collins & Aikman Corp., 25 Cal. App. 3d 987, 993, 101 Cal. Rptr. 347, 351 (1972).  We do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, and that a failure to act

---

other party's promise to do the same."  Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1131 (7th Cir. 1997).  We need not address the question under Connecticut or California law here, however, because even if additional consideration were not required, or it was required but in fact given, the plaintiffs never assented to the emailed terms, as we discuss below.

26

affirmatively to cancel the membership will, alone, constitute assent.[14]

### a. Law of effective notice in terms-later contracting

Courts have recognized that in the modern commercial context, there are reasons to allow parties to contract without consideration of, and the possibility to negotiate, every term. "Cashiers cannot be expected to read legal documents to customers before ringing up sales." Hill, 105 F.3d at 1149. But cases applying the "duty to read" principle to terms delivered after a contracting relationship has been initiated do not nullify the requirement that a consumer be on notice of the existence of a term before he or she can be legally held to have assented to it. "While new commerce on the Internet [and elsewhere] has exposed

---

[14] The email was also unclear, whether deliberately so or otherwise. The subject line reads: "Important information about your membership privileges" without mention of the contract or terms to be included in it. And the body of the email begins with a welcome message, provides a membership number and a username, advises that membership materials will arrive soon by mail, and outlines at some length "your great benefits." It is not until the thirteenth paragraph that the email begins recitation of the "Terms & Conditions" (the arbitration provision following seven paragraphs later). See Mallozzi Aff. Ex. E.; cf. Campbell v. Gen. Dynamics Gov't Sys., 407 F.3d 546, 555 (1st Cir. 2005) ("[A]n e-mail properly couched, can be an appropriate medium for forming an arbitration agreement." (emphasis added)). But even had the email more clearly indicated that it contained an arbitration clause, the fact that it was delivered after enrollment and did not require any affirmative acknowledgment of receipt, see id. ("[i]n many cases, a[ party] will be able to satisfy th[e] relatively light [notice] burden by producing evidence demonstrating that the [other party to the agreement] had actual notice of the agreement."), undermines Trilegiant's assertion that the plaintiffs received sufficient notice to bind them to the additional terms through their inaction.

27

courts to many new situations, it has not fundamentally changed the principles of contract." Register.com, 356 F.3d at 403.

What constitutes sufficient inquiry notice of a term not actually read by the offeree depends on various factors including, but not limited to, the conspicuousness of the term, the course of dealing between the parties, and industry practices. Cf. L&R Realty v. Conn. Nat'l Bank, 246 Conn. 1, 8 n.6, 715 A.2d 748, 752 n.6 (1998) (discussing similar factors in determining whether a party had agreed to a contractual jury trial waiver). Ultimately, however, the touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them.

Courts, including this one, have concluded as a matter of law in some circumstances that parties were on inquiry notice of the likely applicability of terms to their contractual relationship even when those terms were delivered after that relationship was initiated. These decisions appear to have in common the fact that in each such case, in light of the history of the parties' dealings with one another, reasonable people in the parties' positions would be on notice of the existence of the additional terms and the type of conduct that would constitute assent to them.

In Register.com, we considered whether a website development service provider, Verio, was on "legally enforceable notice" of contractual terms restricting Verio in making certain

28

uses of information supplied by Register.com although the terms were submitted to Verio after it had already downloaded the information from Register.com.  Register.com, 356 F.3d at 401. We concluded that Verio was on sufficient notice of the terms because it accessed the information "daily" and was repeatedly confronted with the same terms.  Id.  Thus, even if the terms applying to any given download of information were transmitted after that download, because of the course of dealing between Verio and Register.com, there was a basis for "imputing . . . knowledge of the terms on which the [information] was offered" each time the download occurred.  Id. at 402.

Judge Leval, writing for the Court, provided an extended analogy to a situation in which an offeree would be considered to have assented to a term he or she had not actually read before receiving the benefits of the service or goods offered:

> A visitor, defendant D, takes an apple and bites into it. As D turns to leave, D sees a sign, visible only as one turns to exit, which says "Apples—50 cents apiece."  D does not pay for the apple.  D believes he has no obligation to pay because he had no notice when he bit into the apple that 50 cents was expected in return.  D's view is that he never agreed to pay for the apple. Thereafter, each day, several times a day, D revisits the stand, takes an apple, and eats it.  D never leaves money.
>
> P sues D in contract for the price of the apples taken.  D defends on the ground that on no occasion did he see P's price notice until after he had bitten into the apples.  D may well prevail as to the first apple taken. D had no reason to understand upon taking it

29

that P was demanding the payment.  In our view, however, D cannot continue on a daily basis to take apples for free, knowing full well that P is offering them only in exchange for 50 cents in compensation, merely because the sign demanding payment is so placed that on each occasion D does not see it until he has bitten into the apple.

Id. at 401.[15]  It is elementary that in such circumstances, a reasonable browser becomes aware of the existence of additional terms -- in Judge Leval's example, that the apples must be paid for -- even if he or she is not then familiar with their precise contours -- i.e., the then-current price of each apple.

Similarly in the shrinkwrap cases, when a purchaser opens the packaging for goods and discovers that they are covered by additional provisions, the reasonable purchaser will understand that unless the goods are returned, he or she takes them subject to those provisions.  See Hill, 105 F.3d at 1150 ("Competent adults are bound by such documents, read or unread.").  The late-arriving terms are necessarily included with the product -- they are inside the shrinkwrap with the item being transferred.  See, e.g., M.A. Mortenson Co., Inc. v. Timberline Software Corp., 140 Wash. 2d 568, 575, 998 P. 2d 305, 309 (2000)

---

[15]  The argument may be made that a reasonable purchaser would know, even before biting into the first apple, that it is likely that the store owner expects to be paid for the piece of fruit.  "There ain't no such thing as free lunch."  See William Safire, ON LANGUAGE; Words Out in the Cold, N.Y. TIMES MAGAZINE (February 14, 1993), available at http://www.nytimes.com/1993/02/14/magazine/on-language-words-out-in-the-cold.html (last visited July 11, 2012) (seeking the origin of the expression).  But Judge Leval's point clearly holds with respect to subsequent apple bites.

(noting that even though offeree had not actually read the shrink-wrapped terms, he had actually opened the packaging within which they were enclosed).  The purchaser therefore cannot begin using the product until after he or she has been presented with the terms, whether or not the purchaser actually reads them.  See Specht, 306 F.3d at 33 ("[T]he purchaser in ProCD was confronted with conspicuous, mandatory license terms.").  "[A] 'terms later' [shrinkwrap] offer . . . gives the consumer the leisure to read the terms, and the consumer who forgoes this opportunity has no right to complain."  Posner, 77 U. CHI. L. REV. at 1188.

The amendment cases cited by Trilegiant illustrate other ways in which parties may be put on notice of terms that arrive after a contract is formed -- but all of these cases, too, are rooted, expressly or otherwise, in the reasonable expectations of the parties.[16]  In many of them, courts observe that the "language of the original agreement expresse[s] the intent of making the separate, future terms and conditions a part of the contract."  Schnabel, 2011 WL 797505, at *5, 2011 U.S. Dist. LEXIS 18132, at *18.  "Unilateral modification terms" -- so called because the offeror retains the power to add terms to the agreement while the offeree has no power to do the same -- are

---

[16]  Some of the cases Trilegiant cites are not applicable because they rely heavily upon the provisions of specific state statutes that govern credit-card agreements and explicitly allow for the transmission of amendments after initial enrollment. See, e.g., Kurz, 319 F. Supp. 2d at 463 (citing Del Code Ann. tit. 5, § 952(a)); MBNA Am. Bank, N.A., 2005 WL 1754881, at *2, 2005 Conn. Super. LEXIS 1611, at *4-*6 (discussing Connecticut and Delaware law specifically governing credit card agreements).

31

not necessarily effective.  See generally, Oren Bar-Gill & Kevin Davis, Empty Promises, 84 S. CAL. L. REV. 1 (2010) (describing, among other things, the legal status of "unilateral modification terms").  But the inclusion of such terms at least helps to bolster the offeror's argument that the offeree is on inquiry notice of later arriving terms, particularly where the modification (or amendment) is itself submitted in such a manner that a reasonable offeree would be likely to see it.

For example, in many of these cases the amendment is transmitted with a bill or billing statement concerning the offeree's continued use of the service.  See, e.g., Milligan, 2007 WL 4885492, at *2-*3, 2007 U.S. Dist. LEXIS 96377, at *6-*7 (bill); Kurz, 319 F. Supp. 2d 457, 462 (billing statement).  Even there, whether such notice would be effective in the absence of a statute specifically allowing transmission of new terms after enrollment, see supra note 16, or a term in the original contract giving notice of the possibility of amendment, the conveyance of the amendment in such a manner, similar to the sending of the terms of a contract with the product in the shrinkwrap cases, may support a conclusion that a reasonable person would be on actual notice of the amendment's applicability to the contractual relationship.

**b.  Notice in this case**

In the case at bar, the plaintiffs were presented with the arbitration provision in an email delivered to each of them

32

after they had enrolled in Great Fun. Trilegiant asserts that the fact that we can assume that the email was received by the plaintiffs is enough to support the conclusion that they were on inquiry notice of its terms. But that someone has received an email does not without more establish that he or she should know that the terms disclosed in the email relate to a service in which he or she had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms. See Campbell v. Gen. Dynamics Gov't Sys., 407 F.3d 546, 555-58 (1st Cir. 2005) (concluding that arbitration clause posted on employer's intranet did not apply to employees even though a link to the site was included in an email because, inter alia, there was no evidence "of any other instance in which the company relied upon either an e-mail or an intranet posting to introduce a contractual term. . . ." (emphasis omitted)). The case law does not support such a "terms later by email" conception of contract formation under these conditions.

In this case unlike, for example, Register.com, there was no prior relationship between the parties that would have suggested that terms sent by email after the initial enrollment were to become part of the contract. See Campbell, 407 F.3d at 555-58 (addressing the parties' past dealings in order to determine whether there would be an expectation that contractual terms would follow by email). Nor would a reasonable person likely understand in some other way that disputes arising between him or her and Trilegiant were to be resolved by an alternative

33

dispute resolution procedure. Thus, assuming as Trilegiant asserts that the plaintiffs received the emails in question, "[t]here was [still] no basis for imputing [to the plaintiffs] knowledge of the terms on which [Great Fun] was offered." Register.com, 356 F.3d at 402.

Unlike shrinkwrap agreements, moreover, the recipient of the terms in this case would not have been confronted with the existence of additional terms before being able to benefit from Great Fun. As noted, even if a purchaser of a shrink-wrapped product is not required to read the shrink-wrapped terms or affirmatively to acknowledge their existence before using the product in order to be bound by the terms, at least he or she necessarily learns of the existence of those terms upon opening the packaging -- or, as is the case in many of the amendment cases cited by Trilegiant, during the course of maintaining and using the service to which the terms apply.

By contrast, the arbitration provision here was both temporally and spatially decoupled from the plaintiffs' enrollment in and use of Great Fun; the term was delivered after initial enrollment and Great Fun members such as the plaintiffs would not be forced to confront the terms while enrolling in or using the service or maintaining their memberships. In this way, the transmission of the arbitration provision lacks a critical element of shrinkwrap contracting -- the connection of the terms to the goods (in this case the services) to which they apply.

34

A reasonable person may understand that terms physically attached to a product may effect a change in the legal relationship between him or her and the offeror when the product is used.  But a reasonable person would not be expected to connect an email that the recipient may not actually see until long after enrolling in a service (if ever) with the contractual relationship he or she may have with the service provider, especially where the enrollment required as little effort as it did for the plaintiffs here.  In this context the email would not have "raise[d] a red flag vivid enough to cause a reasonable [person] to anticipate the imposition of a legally significant alteration to the terms and conditions" of the relationship with Trilegiant.  Campbell, 407 F.3d at 557.   And there is nothing in the record to suggest that the email to the plaintiffs "'appear[ed] to be a contract [or that] the terms [were] called to the attention of the [plaintiffs].'"  Specht, 306 F.3d at 30 (quoting Marin Storage & Trucking v. Benco Contractor & Eng'g, 89 Cal. App. 4th 1042, 1049-50, 107 Cal. Rptr. 2d 645, 651 (Cal. Ct. App. 2001)).

To be sure, the "duty to read" rule combined with the "standardized form" contract makes it unlikely in many contexts that a consumer will actually read such a agreement beyond a quick scan, if that.  See Charles L. Knapp, Taking Contracts Private: The Quiet Revolution in Contract Law, 71 FORDHAM L. REV. 761, 770 (2002).  "A party who makes regular use of a standardized form of agreement does not ordinarily expect his

35

customers to understand or even read the standard terms.  One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms."  Restatement (Second) of Contracts §211 cmt. b (1981).  But inasmuch as consumers are regularly and frequently confronted with non-negotiable contract terms, particularly when entering into transactions using the Internet, the presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her.

Here, Trilegiant effectively obscured the details of the terms and conditions and the passive manner in which they could be accepted.  The solicitation and enrollment pages, along with the fact that the plaintiffs were not required to reenter their credit-card information, made joining Great Fun fast and simple and made it appear -- falsely -- that being a member imposed virtually no burdens on the consumer besides payment.

Courts endorsing the shrinkwrap-contracting framework often sprinkle their analyses of whether a consumer was on notice of the provision with the policies justifying shrinkwrap contracting.  See, e.g., Hill, 105 F.3d at 1149; ProCD, 86 F.3d

36

at 1452; Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 251, 676 N.Y.S. 2d 569, 572 (1st Dep't 1998). Some commentators have observed that the Seventh Circuit endorsed the model precisely because of the benefits it provides consumers, who can read the terms attached to the packaging of the good at their own leisure. Posner, at 1188. Here, however, there is no policy rationale supporting Trilegiant's approach inasmuch as there are a plethora of other ways -- such as requiring express acknowledgment of receipt of the terms -- through which Trilegiant could have met the minimum requirements of notice. See Campbell, 407 F.3d at 556 ("This defect weighs all the more heavily because it could so easily have been remedied."). No court, so far as we are aware -- in Connecticut, California, or elsewhere -- has concluded that the "duty to read" covers situations like this one and, for the foregoing reasons, we decline to do so here.

3. Assent. A requirement that the plaintiffs expressly manifest assent to the arbitration provision together with such assent would likely have overcome the email's defects in providing notice. See id. (describing emails including employment terms that call for the employee's express acknowledgment of receipt). Yet Trilegiant argues that the plaintiffs agreed to the provision through far more passive conduct -- continuing to pay their monthly membership fees, which were automatically charged to the plaintiffs' credit cards, after receipt of the emails. It does not follow, however, from the fact that this conduct may, in other situations, be consistent

37

with assent to a contractual term that there was indeed such assent here. In order to constitute acceptance, the failure to act affirmatively must carry a significance that reasonable people in the parties' positions would understand to be assent. See, e.g., Karlin v. Avis, 457 F.2d 57, 61-62 (2d Cir. 1972) (recognizing that under New York law, silence constitutes assent only in particular circumstances, such as where there is a duty to respond or where there is a contemporaneous oral agreement). A party cannot require an evidentiary trial before a trier of fact simply by asserting that the other party assented through a failure to respond to proffered contractual terms. There must be facts in the record to support a finding that the counter-party intended to accept the terms. Such acceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound. See, e.g., Register.com, 356 F.3d at 403. ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree.").

That is not the case here. The plaintiffs were never put on inquiry notice of the arbitration provision, and their continued credit-card payments, which were auto-debited from their credit cards, were too passive for any reasonable fact-

38

finder to conclude that they manifested a subjective understanding of the existence of the arbitration and other emailed provisions and an intent to be bound by them in exchange for the continued benefits Great Fun offered.

Both parties, and the district court, see Schnabel, 2011 WL 792505, at *6, 2011 U.S. Dist. LEXIS 18132, at *19-*20, analogize this case to the Supreme Court of Alabama's decision in Memberworks Inc. v. Yance, 899 So. 2d 940 (Ala. 2004). There, an arbitration provision was found to be included in an agreement to participate in a membership club even though that provision was only included in an additional terms letter sent to the plaintiff after he had joined the club in an oral agreement over the phone. See id. at 941-44. Like the plaintiffs here, the plaintiff argued that he never assented to the term because "he never engaged in any 'intentional conduct' that would have manifested his assent to the arbitration provision[:] He . . . never had any contact with [the defendant] subsequent to his initial telephone call to a call center, [and he] never availed himself of any of the services available to participants in the [discount] program." Id. at 943. Nonetheless, an agreement was formed because the plaintiff "paid his credit-card bill for two years without any question as to the legitimacy of the charge." Id.

Assuming that Yance did not read the arbitration provision and actually understand that not cancelling his

membership would constitute assent to the provision,[17] we think the Alabama court misconstrued the general principle that a party can under certain circumstances assent through silence or a failure to act, see Restatement (Second) of Contracts § 19, by concluding that conduct that is merely consistent with assent is enough to establish a binding agreement as a matter of law. Like the plaintiffs here, Yance was never put on notice of the possibility of future amendments to the contract during his initial interaction with the defendants, see id. at 949 (Houston, J. dissenting), and -- unlike the purchaser in a shrinkwrap case -- he would not have been put on inquiry notice of the arbitration provision through the subsequently submitted terms and would not have understood that his continued enrollment in the service would constitute assent to such a provision. In this context, a merchant "can[not] rely upon the failure of a customer to affirmatively act" to cancel his membership. Id. at 949.

B. The Hyperlink

The accessibility of the arbitration provision from a hyperlink on the enrollment screen, as appears to have been the case here, might have created a substantial question as to

_____

[17] If Yance was on actual notice -- which is not made clear in the court's opinion, see id. at 943 (majority opinion) ("[The plaintiff] argues that Memberworks at best merely 'proposed arbitration' by later sending him a notice that all disputes would be resolved by arbitration."), then, we think, the Alabama court's analysis is on firmer footing. Even if he was on actual notice of the term, however, he did not assent through his failure to cancel his membership unless a reasonable person in his situation would have understood that his conduct would be interpreted by the offeror as assent.

40

whether the provision was part of a contract between the parties.[18]  The issue is not before us, however.  Trilegiant forfeited the argument by not raising it in the district court.

---

[18]  In Specht, then-Judge Sotomayor wrote at length about the status of what would later be termed "browsewrap" agreements, which disclose terms on a webpage that offers a product or service to an Internet user; the user then assents to the provision merely by visiting the website to purchase the product or enroll in the service.  See 306 F.3d at 30-32; Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 429 (2d Cir. 2004) (using the term "browsewrap").  Provisions disclosed solely through browsewrap agreements are typically enforced if "the website user must have had actual or constructive knowledge of the site's terms and conditions, and have manifested assent to them." Cvent, Inc. v. Eventbrite, Inc., 739 F. Supp. 2d 927, 937–38 (E.D. Va. 2010) (emphasis added); accord Fteja v. Facebook, Inc., No. 11 Civ. 918, 2012 WL 183896, at *6, 2012 U.S. Dist. LEXIS 12991, at *14 (S.D.N.Y. Jan. 24, 2012).  In Specht, we concluded that a provision that a user would not encounter until he or she had scrolled down multiple screens was not enforceable because "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms."  306 F.3d at 32.

Browsewrap agreements are treated differently under the law than "clickwrap" agreements.  The latter "present[] the potential licensee . . . with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon," Register.com, 356 F.3d at 429 (internal quotation marks omitted), rather than browsing down through subsequent screens.  Users are thus "forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." Id.

The presentation of terms on the screens in the case before us falls outside both the clickwrap and browsewrap categories.  Unlike the paradigmatic browsewrap agreement, in this case there is some indication near the button that a user must "click" in order to subscribe to the service, that the service includes additional terms and that the user assents to these terms by clicking the button.  In contrast to the typical clickwrap agreement, however, the button itself does not make explicit reference to these terms in asking the end-user whether he or she assents to them.  It only suggests that a user can sign up for the benefits of the membership by clicking "Yes."

41

"'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'" Local 377, RWDSU, UCFW v. 1864 Tenants Ass'n, 533 F.3d 98, 99 (2d Cir. 2008) (per curiam) (quoting Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994)). "[W]e may consider a forfeited argument [only] if there is a risk that 'manifest injustice' would otherwise result." Katel Ltd. v. AT&T Corp., 607 F.3d 60, 68 (2d Cir. 2010). Trilegiant's inability to raise a possibly meritorious argument as to why it is contractually entitled to arbitration on the plaintiffs claims is not, in our view, a "manifest injustice."

In its Memorandum in Support of the Motion to Compel Arbitration, Schnabel v. Trilegiant Corp., 10-cv-00957 (D. Conn. Sept. 29, 2010), ECF No. 23 ("Mot. to Compel"), Trilegiant failed to mention the hyperlink. And accompanying the motion was an affidavit from an employee referring only to the emailed arbitration clause sent to each of the plaintiffs after their enrollment in Great Fun, not the clause that they say was available by clicking "Yes" on the sign-up button. See Mallozzi Aff. ¶ 13.

Although the district court record includes the screenshot of the enrollment screen, which displays the hyperlink, Mot. to Compel, Ex. A, under the principle of party presentation, the district court was free to "rely on the parties to frame the issues for decision . . . ." Greenlaw v. United States, 554 U.S. 237, 243 (2008). Indeed, it seems likely that

42

the district court not only did not mention the hyperlink, but pointed out the peculiarity of the fact that the enrollment screen did not seem to indicate to the user that he or she would be bound by additional terms, precisely because the issue was not raised.  See Schnabel, 2011 WL 797505, at *5 n.8, 2011 U.S. Dist. LEXIS 18132, at *17 n.8 (noting the absence of clickwrap terms). We will not address this argument in the first instance on appeal.

**CONCLUSION**

For the foregoing reasons, we affirm the order of the district court denying the defendants' motion to compel arbitration, and remand the case to that court for further proceedings.